UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  4/30/2026

JOHN BAXTER, *individually and on behalf of all others* : 
*similarly situated*,

                       Plaintiff,

              -v-

MONGODB, INC., *et al.*,

              Defendants.

------------------------------------------------------------------- X

1:24-cv-5191-GHW

<u>MEMORANDUM OPINION</u>
<u>AND ORDER</u>

GREGORY H. WOODS, United States District Judge:

## I.   INTRODUCTION

MongoDB, Inc. ("MongoDB") is a database platform company that sells access to database platforms and related services, including its signature, cloud-based database product, Atlas.  At the end of the first fiscal quarter of 2025, MongoDB warned investors that it might not meet its revenue forecasts for that year.  As a result, MongoDB adjusted its forward-looking revenue projections for 2025 downward.  Following that announcement, MongoDB's stock price dropped.  Lead Plaintiffs allege that the stock drop was due in part to MongoDB's strategic decision to transition to a consumption-based pricing model which resulted in its failure to acquire "high-quality" "workloads"—client subscription contracts to use MongoDB's database products—in fiscal year 2024 ("FY 2024").

Lead Plaintiffs assert that MongoDB and its executives made materially misleading statements in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Specifically, Lead Plaintiffs allege that Defendants knew, but failed to disclose that the company's transition to a consumption-based pricing model resulted in a "glut" of newly acquired FY 2024 workloads that were consuming and growing at slower rates than new workloads

had in the past, or not at all.[1]  Lead Plaintiffs allege that despite MongoDB's knowledge that the workloads that MongoDB acquired under its new pricing model were not consuming as expected, Defendants misled investors with respect to their performance; deceptively claiming instead that the newly acquired workloads were "high-quality."  Defendants move to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6), arguing that Lead Plaintiffs fail to adequately plead that Defendants' statements were false or misleading and fail to allege facts to support a strong inference that Defendants had the requisite scienter at the time the statements were made.

Defendants' motion is GRANTED IN PART and DENIED IN PART.  Some, but not all, of the challenged statements are inactionable either because the statements are puffery, statements of opinion that were not rendered misleading by omission of information as to the FY 2024 workloads' consumption rates, not adequately alleged to be misleading by omission, or forward-looking statements accompanied by meaningful cautionary language.  However, Lead Plaintiffs have adequately pleaded scienter with respect to the plausibly misleading statements which failed to disclose that the FY 2024 workloads were not consuming as expected.

## II.    BACKGROUND

### A.  Facts[2]

#### 1.  Parties

Lead Plaintiffs purchased MongoDB securities between June 1, 2023 and May 30, 2024 (the "Class Period").  AC ¶ 1.

---

[1] In their complaint, Lead Plaintiffs refer to the FY 2024 workloads as, alternatively:  having "slowed," consumption and growth, "consuming and growing at slower than historical rates, or not at all," "consuming and growing slower than expected, or not at all," and "low-quality workloads that consumed less (or not at all) and did not grow at historical rates."  The Court adopts and uses this language interchangeably in this opinion and uses the phrases "not consuming" or "not consuming as expected" as shorthand.

[2] The facts are taken from the Amended Complaint, Dkt. No. 60 ("AC"), and are accepted as true for the purposes of this motion.  *See, e.g.*, *Town of Babylon v. Fed. Hous. Fin. Agency*, 699 F.3d 221, 227 (2d Cir. 2012).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Defendant MongoDB is a New York corporation with its principal office located in New York City. *Id.* ¶ 19. MongoDB is a "global software company that sells document database platforms and related services." *Id.* ¶ 2. MongoDB's "principal focus is the acquisition of new 'workloads'"—subscription contracts to use its database products. *Id.* MongoDB's common stock trades on the NASDAQ. *Id.* ¶ 19.

Defendant Dev C. Ittycheria was MongoDB's Chief Executive Officer, President, and was a member of MongoDB's board of directors at all relevant times; Defendant Michael Lawrence Gordon[3] was MongoDB's Chief Operating Officer and Chief Financial Officer at all relevant times; and Defendant Srdjan ("Serge") Tanjga was MongoDB's Senior Vice President of Finance at all relevant times (collectively, the "Individual Defendants"). *Id.* ¶¶ 20–24.

### 2. Changes to MongoDB's Go-To-Market Strategy

Lead Plaintiffs allege that from the time MongoDB began operating in 2017 to when MongoDB first launched its cloud-based platform, Atlas, MongoDB "used a traditional commitment-based go-to-market strategy" to sell its database services. *Id.* ¶ 43. Under a "commitment-based" strategy, MongoDB's "sales representatives were incentivized to sell a[n up-front] commitment for a certain dollar amount"—the customer pays a fixed amount in advance notwithstanding how much (or how little) the customer ultimately uses MongoDB's platforms. *Id.* Under this model, a database company sells its products pursuant to a "perpetual license" and "sales representatives focus[] on large upfront deals that lock[] the customer in for a period of time," typically one year. *Id.* ¶ 42. However, in 2022, MongoDB "observed a slowdown in customer's application usage on [its] platform," *id.* ¶ 4, which caused MongoDB to reevaluate its existing go-to-market strategies.

---

[3] On December 9, 2024, MongoDB announced that Mr. Gordan would be "stepping down at the end of the [] fiscal year on January 31, 2025," *id.* ¶ 21, and that, beginning on February 1, 2025, Mr. Tanjga would serve as interim Chief Financial Officer "if a permanent successor ha[d] not been named by that date," *id.* ¶ 22.

In response to the 2022 market slowdown within the software sector and changing market preferences—which had shifted to accommodate more consumer-focused pricing practices[4]—MongoDB decided to deemphasize upfront commitments and instead began "focusing on acquiring a large volume of new customers quickly." *Id.* ¶¶ 4, 44.  MongoDB believed that deemphasizing upfront commitments would help reduce "friction" in acquiring new workloads by reducing some of the "burdens [associated with negotiating an upfront] commitment with a customer." *Id.* ¶ 45. Accordingly, MongoDB pivoted from its prior commitment-based model and began incentivizing a "consumption-based model"[5]—under which MongoDB customers would pay based on their actual usage of MongoDB's databases.  *Id.* ¶ 44.  In contrast to its former commitment-based model, under a consumption-based model, customers "pay as they go," and only "pay for what they use and get billed in arrears for their consumption." *Id.* ¶ 42.  Mr. Ittycheria made clear that MongoDB was "intentionally collecting less cash upfront in order to win more workloads more quickly." *Id.* ¶ 47.

Following the implementation of its consumption-based pricing model, MongoDB recognized that its sales representatives remained incentivized to close traditional commitment-based deals "because doing so could quickly retire their quotas." *Id.* ¶ 44.  In order to incentivize its sales representatives to sell services under a consumption-based pricing model, MongoDB "began compensating its sales representatives . . . based on the customer's 'run rate' at the end of the quarter, which was . . . based on tracking the customer's actual consumption." *Id.*  And in order to track customer consumption for workloads acquired on a consumption-basis, the head of the

---

[4] Historically, other large database companies like Oracle popularized selling software under a commitment-based approach.  *Id.* ¶ 42.  But newer market participants, like Salesforce "later popularized a subscription-based model," commonly referred to as "software-as-a-service," ("SaaS") "where customers rented the software and would renew annually, which was considered a more customer-friendly approach." *Id.*  Even more recently, software "hyper-scalers," which include companies like Amazon Web Service and Microsoft Azure, "popularized an even more customer-friendly sales approach referred to as consumption-based pricing." *Id.*

[5] MongoDB has also referred to this go-to-market strategy as its "elastic invoicing" model.  *Id.* ¶ 44.  Throughout this opinion the terms "go-to-market strategy," "elastic invoicing model," and "consumption-based model" are used interchangeably.

company's sales operations, Megan Gill,[6] created a "run rate opportunity" program in Salesforce, which tracked sales, consumption, and other customer-related information. *Id.* The "run rate opportunity" program would "update[] every day with the consumption" and "close[] at the end of the quarter" in order to "track[] the consumption of that customer over time." *Id.*

By the beginning of FY 2024, MongoDB had fully embraced a consumption-based pricing model and eliminated all compensation for sales representatives for obtaining commitment-based purchases from customers. *Id.* ¶ 46. As Mr. Ittycheria explained during the 2023 Goldman Sachs Communacopia + Technology Conference ("2023 GS Conference"), MongoDB had decided to "stop paying [] salespeople [] even on 1-year commitments" because MongoDB was "orienting [its] go-to-market organization to just acquire new workloads." *Id.* ¶ 48. MongoDB's "incentive mechanisms, management attention and focus [became] all about this North Star[—]about acquiring new workloads." *Id.* ¶ 55.

And to better align with its new "North Star," MongoDB changed not only its incentive structure, but also restructured its sales teams. *Id.* ¶ 49. MongoDB "segmented its sales force between an acquisition team that focused solely on landing new deals and acquiring new customers, and a growth (or expansion) team that was responsible for growing the account." *Id.* Because MongoDB uses the term "logos" to refer to new customers launching new workloads, the new acquisition team was also called the new "logo team" as it focused exclusively on onboarding new customers launching new workloads as opposed to existing customers opening new workloads. *Id.* The logo team's compensation was based solely on the number of new workloads acquired. *Id.* Accordingly, sales representatives on the logo team were compensated with a "flat bounty" for each

---

[6] Ms. Gill began working for MongoDB in 2009, when she was hired as the Senior Director of Marketing, a position she held for approximately the next seven years. Shortly before MongoDB's IPO, Ms. Gill transitioned to heading MongoDB's sales operations. At the time the AC was filed, she was the SVP of Sales Operations & Sales Development. *Id.* ¶ 42 n.5. In their opposition to Defendants' motion to dismiss, Lead Plaintiffs note that "weeks after Plaintiffs filed the AC, Gill . . . left MongoDB." Dkt. No. 76 ("Opp'n") at 6 n.5.

new customer who launched a new workload, but not for existing customers purchasing additional workloads—allowing MongoDB to acquire new customers and new workloads faster.  *Id.*

### 3. MongoDB's Newly Acquired Workloads Consume Less than Expected and MongoDB Obtains Less Customer Information

Lead Plaintiffs allege that starting in 2023, MongoDB began to realize that its change to a consumption-based model incentivized sales representatives to acquire new "low-quality" and "slow-growing" workloads that ultimately never actually used MongoDB's databases.  *Id.* ¶¶ 51, 52. And Lead Plaintiffs allege that, around the same time, MongoDB realized that "[a]n unintended consequence of reducing friction is you actually have less information about everything."  *Id.* ¶¶ 51, 52. ("[T]he 'natural consequence' of the Company's decision to jettison its incentives for upfront commitments and emphasize volume over quality—[] [was] reduced visibility for sales representatives into growth prospects of newly-acquired workloads that drove a glut of low-quality, slow-growing workloads.").

In particular, Lead Plaintiffs point to Ms. Gill's comments made during a workshop held on November 1, 2023, to support the conclusion that during the Class Period, MongoDB and the Individual Defendants knew that its newly acquired FY 2024 workloads were slow-growing and not consuming as expected.  *See generally* Dkt. No. 75-24 ("Gill Tr.").  During the workshop, titled "Rethinking Sales Consumption for a Consumption-Based GTM with MongoDB," Ms. Gill explicitly acknowledged that "the con" of "hav[ing] a unit-based plan," like MongoDB's new consumption-based model and incentive structure, is that it may "run into the risk of driving a lot of low-quality stuff."  *Id.* at 9.  She also stated that "when [MongoDB] first introduced [its] new logo team," the new logo team "had a lot of reps that were overachieving landing new logos that had signed a contract but never even actually consumed."  *Id.*  And Ms. Gill explained that after MongoDB introduced Atlas in 2016, MongoDB had "over the past few years [] moved . . . to a consumption all-in, a pure consumption model."  *Id.* at 2.

In light of that transition, Ms. Gill was focused on "operationaliz[ing] [] being a consumption and a . . . workload-oriented business meaning that . . . [MongoDB was] trying to drive the sales reps to close what we call workloads that will uptick the consumption." *Id.* at 3.  And Ms. Gill noted that MongoDB had begun to do so and had "completely reoriented all of [its] tools and [its] systems to be this workload-centric, consumption-oriented approach," including the reorientation of its sales team.  *Id.*  As she explained, MongoDB had decided to—

> [d]isincentivize[] reps f[rom] making commitments upfront because [MongoDB] found that that was creating friction in the sales cycle and what [it] really wanted was for customers just to get up and running on our software, start to see value, and take that time back from negotiating to focus on getting them successful with that first workload so that [it] could then go upsell [] future workloads.

*Id.* at 5.  Specifically, she explained how MongoDB "segmented between acquisition and growth" creating a "dedicated new logo team."  *Id.* at 8.  "That new logo team lands deals that they pass to an expansion team . . . and we compensate them on a combination of a unit-based metric so a volume-based metric like the number of new logos they're landing as well as a quality metric."  *Id.* at 8–9.

And Ms. Gill highlighted the importance of "thinking about being able to measure sales impact."  *Id.* at 7.  She went on to describe that "this is something we put a lot of work into internally at MongoDB and we've actually built into the product [to measure sales]" and "we actually run a control group . . . that control group helps us understand what happens when we don't have anybody touching those accounts[] [and] [w]hat growth should we expect."  *Id.*

As noted above, Ms. Gill also identified some of the potential "pros and cons" of MongoDB's new approach.  Specifically, she discussed how—

> Measuring on a unit basis has some really good pros and cons so one is it's dead simple. It really focuses the reps and it will drive a lot of velocity and activity.  The con is that it's always harder to overachieve on a unit-based plan which is why it's potentially good to have a blend to mix the elements between ARR and something unit-based and when you have a unit-based plan you always run into the risk of driving a lot of low-quality stuff.  So when we first introduced our new logo team it was a pure unit volume game and they just had to sign a contract and we had a lot of reps that were overachieving landing new logos that had signed a contract but never even actually consumed so

> that's when we started introducing like okay we're now in order for your to get your unit-based payment, the customer has to consume at a certain level in order for you to get credit for that and then later on we then introduced ARR.  So now they get a mix of ARR and this unit-based metric in their comp plan.

*Id.* at 9.

And Lead Plaintiffs allege that, because MongoDB recognized that its decision to transition to a consumption-based model resulted in what Lead Plaintiffs characterize as a "go-to-market failure in early fall of 2023," MongoDB engaged in an "atypical maneuver" and implemented additional changes to its sales compensation plans for that year.  AC ¶ 51 (alleging that such a move was "atypical" because MongoDB typically only makes compensation changes once annually).  Specifically, MongoDB partially reversed course and, as described by Ms. Gill, introduced, in conjunction with its "unit-based payment" compensation incentive for sales representatives, requirements that newly acquired workloads must "consume at a certain level" before a sales representative would "get credit" for the newly acquired workload.  *Id.* ¶¶ 50, 51.

Similarly, Lead Plaintiffs allege that, at least as early as May 2024, MongoDB had realized that its decision to deemphasize upfront commitments and instead emphasize acquiring new consumption-based workloads resulted in an "unintended consequence"—that MongoDB had "less information about everything."  *Id.* ¶ 52.  During MongoDB's May 30, 2024 earnings call, Mr. Gordon acknowledged that MongoDB's decision to "mov[e] in a frictionless manner to get more workloads" meant that it was not "get[ting] all the information" that it had previously been getting when negotiating and signing commitment-based workloads.  *Id.*  This is because, in negotiating a contract for a new workload under a commitment model, "sales representatives . . . [and] sales engineers[] gathered vast amounts of information from customers about the quality of the workloads, including projected usage."  *Id.* ¶ 45.

At the June 4, 2023 Baird Global Consumer, Technology & Services Conference (the "Baird Conference"), Mr. Gordon reiterated that MongoDB was aware that one of the consequences of

switching to a consumption-based model was the loss of data about newly acquired workloads that MongoDB had previously obtained during the commitment negotiation process. *Id.* ¶ 53. And at another conference one day later, Mr. Gordon again acknowledged that because MongoDB was "not looking for a commitment," it was "going to lose a whole bunch of information or not have access to a whole bunch of information, not gain a whole bunch of information that [the customer] is going to disclose to [MongoDB while] . . . going back and forth and negotiating." *Id.* ¶ 53.

### 4. MongoDB Tracks Usage by New Workloads Acquired Under the Consumption Model

During the Class Period, MongoDB and its executives were allegedly well-aware that new workloads acquired after its decision to transition to a consumption model were both slow-growing and not consuming as expected. *Id.* ¶ 65 ("While Defendants quickly understood that their FY 2024 go-to-market changes . . . ."). Lead Plaintiffs allege that Defendants knew that the newly acquired workloads were slow-growing and not consuming as expected for two reasons. First, because Defendants closely tracked data showing the poor performance of the workloads, which "undoubtedly altered them to the slowed growth trajectories." *Id.* ¶ 71. Specifically, Lead Plaintiffs allege that throughout the Class Period, MongoDB and its executives "closely tracked workload-related consumption data in order to analyze [and forecast] the growth pattern of new Atlas workloads . . . [and] to ensure that [new workload acquisition] goals were being met." *Id.* ¶ 55. Lead Plaintiffs allege that the extent to which MongoDB's executives tracked workload-related consumption is evidenced by various statements made by the executives at various conferences, meetings, and interviews during the Class Period.

And Lead Plaintiffs allege that Mr. Ittycheria "in particular had extensive involvement in and knowledge of MongoDB's sales operations, including" tracking new workload acquisition and consumption, as evidenced by his "deep conversance with the Company's sales organization" during "podcast interviews, sales forums, and investor conferences." *Id.* ¶ 56 (asserting that in November

9

2023, MongoDB's head of sales "confirmed . . . that she discussed sales incentives with Ittycheria and the Company's Chief Revenue Officer ('CRO'), Cedric Pech."). Many of Lead Plaintiffs' allegations with respect to Mr. Ittycheria's hands-on approach to his role as CEO and involvement in tracking performance of newly acquired workloads predate MongoDB's IPO and the relevant Class Period.[7] Lead Plaintiffs advance some allegations with respect to Mr. Ittycheria's involvement in tracking consumption that occurred during the Class Period. For example, during an October 2023 interview, Mr. Ittycheria represented that it was his practice to personally "attend[] quarterly review sessions . . . [and] sales forecast reviews." *Id.* ¶ 59. And during a May 14, 2024 podcast, Mr. Ittycheria stated that the "consumption business gives [] a real time view of demand," allowing MongoDB to "engag[e] with the customers almost on a daily, worst case weekly, basis to understand what's going on" and to ensure that "workloads grow well." *Id.* ¶ 60.

With respect to Mr. Gordon and Mr. Tanjga, Lead Plaintiffs allege that they "also exhibited deep familiarity with MongoDB's go-to-market efforts, consumption data, and workload growth." *Id.* ¶ 61. Specifically, Lead Plaintiffs allege that during MongoDB's earning call on August 31, 2023, Mr. Gordon represented that, "we continually review and analyze product usage signals to determine the growth potential of our customers." *Id.* And during a conference on September 7, 2023, Mr. Tanjga stated that "we have access to a tremendous amount of data, and we try to become more intelligent over time as we use that data and usage patterns to judge our customers' potential." *Id.* ¶ 62. And Lead Plaintiffs contend that statements by Mr. Gordon which post-date the Class Period

---

[7] Lead Plaintiffs allege that since Mr. Ittycheria became CEO in 2014, "he has set himself apart as an 'in-the-trenches' manager." *Id.* ¶ 57. For example, prior to MongoDB's IPO, Mr. Ittycheria "closed deals himself and personally interviewed all of the Company's sales leaders and representatives." *Id.* And Mr. Ittycheria would meet with his heads of sales at least weekly, and on occasion even more frequently than that, to discuss, among other topics, "what happened last quarter [and] . . . [the] lessons . . . learn[ed]," "how the organization is set up for the rest of the year," and "the forecast for the current quarter." *Id.* ¶ 58. Lead Plaintiffs similarly allege that in a May 2021 interview, Mr. Ittycheria discussed his involvement in forecasting MongoDB's productivity based on sales quota data. *Id.* ¶ 59. But Lead Plaintiffs do not allege that Mr. Ittycheria's "in-the-trenches" management style continued through the Class Period; seven years after Mr. Ittycheria represented that he attended sales meeting on a weekly basis.

"suggest" that MongoDB and its executives "would have known from incremental consumption data that by . . . [[June 1, 2023[], new Atlas workloads from the first quarter of FY 2024 were growing slowly or not at all."  *Id.* ¶ 63.

Second, Lead Plaintiffs allege that Mr. Ittycheria and Mr. Gordon were able to capitalize on access to the non-public information that the FY 2024 workloads were not consuming as much as workloads acquired under the prior sales model, "reaping massive proceeds from offloading their Company stock at artificially inflated prices."  *Id.* ¶ 9.  The Individual Defendants "embarked on this massive insider selling spree" because they had access to non-public information that the new workloads were slow-growing and not consuming as expected.  *Id.* ¶ 72.  Specifically, Lead Plaintiffs allege that during the Class Period, Mr. Ittycheria, Mr. Gordon, and Mr. Pech collectively sold over $250 million worth of MongoDB stock.  *Id.*

### 5.  MongoDB's Form 10-K Risk Disclosures

Throughout the Class Period, MongoDB expressly warned and repeatedly disclosed to investors the risk of reduced consumption and of reduced Atlas consumption in particular.  *See generally* Dkt. No. 75-2 (2023 10-K); Dkt. No. 75-3 (2020 10-K;); Dkt. No. 75-4 (2021 10-K); Dkt. No. 75-5 (2022 10-K); Dkt. No. 75-11 (2024 10-K).  In its 2023 Form 10-K MongoDB generally cautioned that—

> Our business and results of operations depend substantially on our customers renewing their subscriptions with us and expanding their usage of software and related services.  Any decline in our customer renewals or failure to convince our customers to broaden their usage of subscription offerings and related services could materially and adversely harm our business, results of operations and financial condition. . . .
>
> Because we derive the majority of our revenue from MongoDB Atlas, failure of MongoDB Atlas to satisfy customer demands could adversely affect our business, result of operations, financial condition and growth prospects and our future revenue may be more difficult to predict. . . .
>
> If we do not effectively expand our sales and marketing organization, we may be unable to add new customers or increase sales to our existing customers.

11

Dkt. No. 75-2 at 14.  MongoDB stated that its "historical revenue growth has been inconsistent and should not be considered indicative of [] future performance," and that its "revenue growth could slow" for a "number of reasons, including slowing adoption or usage of MongoDB . . . or our failure, for any reason, to continue to capitalize on our growth opportunities."  *Id.* at 16.  And it also cautioned that "the growth of our business depends in part on our customers expanding their use of [] offerings and related services, including increasing their usage and workloads with us."  *Id.*  And "[h]istorically, some of our customers have elected not to renew with their subscriptions with us or have not expanded their usage of our services over time for a variety of reasons, including as a result of changes in their strategic IT priorities, budgets, costs, and in some instances, due to competing solutions."  *Id.*  "As a result, we cannot assure you that customers will renew subscriptions or increase their usage of our software and related services."  *Id.*

And with respect to Atlas consumption in particular, MongoDB explained that "[w]e derive and expect to continue to derive the majority of our revenue from MongoDB Atlas . . . which is primarily recognized on a usage-basis [and] [a]s such, market adoption and usage of MongoDB Atlas is critical to our continued success."  *Id.* at 16.  MongoDB specifically disclosed that it "cannot guarantee that rate of adoption will continue at the same pace or at all."  *Id.*  As it explained—

> Demand for MongoDB Atlas is affected by a number of factors, many of which are beyond our control, including economic downturns, continued market acceptance by developers, the availability of our Community Server offering, the continued volume, variety and velocity of data that is generated, timing of the development and release of new offering by our competitors, technological change and the rate of growth in our market.

*Id.*  As a result, MongoDB disclosed that there "is a risk that customers will consume our MongoDB Atlas offering more slowly than we expect, and our actual results may differ from our forecasts and our future revenue may be less predictable going forward due to, among other things, fluctuations in the rate of customer renewals and expansions and seasonality of, or fluctuations in, usage of MongoDB Atlas."  *Id.* at 16.  Finally, MongoDB disclosed that it "continues to evolve [its]

compensation programs to maintain competitive alignment with market practices while ensuring all pay decisions are driven by performance." *Id.* at 8.  MongoDB restated these disclosures during every quarterly filing and directed investors to the current disclosures in each earnings release and earnings call throughout the Class Period.

> **6.  Defendants' Statements About the "Record Number" of Newly Acquired Workloads, Workload Growth and Performance, MongoDB's New Go-to-Market Strategy, and Company Performance and Growth**

Lead Plaintiffs allege that during the Class Period, MongoDB and its executives made public statements about both the "record number" of new workloads acquired after its decision to transition to a consumption model, and the positive effect those workloads had on MongoDB's overall performance, while simultaneously failing to disclose that those newly acquired workloads were slow growing, not consuming as expected, and "would erode MongoDB's long-term growth." AC ¶ 65.  The AC outlines several statements alleged to be misleading by omission.  These statements were all made by the Individual Defendants on earnings calls, at conferences, or in public filings during the Class Period.

The Court groups these statements into five categories[8] based on Lead Plaintiffs' allegations: (1) statements regarding workload quality, growth, and consumption trends;[9] (2) statements

---

[8] The Court adopts the categories used by Lead Plaintiffs in their chart identifying their arguments against dismissal with respect to each of the challenged statements, which Lead Plaintiffs attached as an exhibit to their opposition.  *See generally* Dkt. No. 77-1.

[9] This category contains the following statements:  AC ¶ 84 ("Our ability to win new workloads remained strong, and Atlas consumption trends were better than expected."); *id.* ¶ 87 ("The only way we can really influence that is, over the long term, by acquiring more and more workloads either [] from existing customers or acquiring new customers.  And so we're really focused on what we can control, which is all about acquiring new customers and new workloads."); *id.* ("[W]e also don't just focus on acquiring but also making sure they're onboarded properly; they're serviced properly so that those workloads grow well . . . . That's ultimately the things that we can control and that's what we're really focused on."); *id.* ¶ 89 ("[I]t's all about us acquiring high-quality workloads.  If we can []acquire high-quality workloads, onboard them well and make sure they're serviced as well, good things will happen, and that's happening."); *id.* ¶ 94 ("[T]he way that we really grow within the account is winning additional workloads."); *id.* ("[I]nitial workload grows—the first couple of years tend to be where there's the fastest growth, but the workload is still continu[ing] to grow for many, many years."); *id.* ("But over time, the way you grow within the account is adding new workloads."); *id.* ¶ 95 ("[W]e have to win that first initial workload.  That workload will grow based on a number of application-specific factors, but also based on the macroeconomic environment."); *id.* ("In the long term, though, Atlas growth is driven by our ability to acquire

new workloads. That's really the key thing because new workloads, in the long run, will drive most of the growth."); *id.* ("And the reality is the new workloads you add over that subsequent workload wind up being responsible for the vast majority of the incremental growth."); *id.* ¶ 110 ("[W]hat we've particularly become more comfortable over time is our ability to call when we see that there's incremental workload potential in the account."); *id.* ¶ 118 ("We continue to see growth of existing customers and existing workloads grow healthfully."); *id.* ¶ 119 ("We spend a tremendous amount of time focusing on . . . 'Are we acquiring new workloads? Are we doing that if they are the same quality or better than what we've done in the past?'"); *id.* ¶ 127 ("Atlas consumption trends have been steady for several quarters now and we experienced less consumption variability in fiscal '24 compared to fiscal '23."); *id.* ("[W]e see stable growth—stable usage growth across our portfolio of workloads."); *id.* ¶ 128 ("I remain highly confident about our ability to execute on our long-term growth opportunity."); *id.* ¶ 130 ("Atlas looks consistent from a consumption standpoint. And that's in line with the stable trends we've seen over the course of fiscal '24."); *id.* ¶ 134 ("And what you can see if as you add in those first workloads, they sort of are accretive to growth, right? They're adding to the growth rate."); *id.* ("[W]hat that meant in fiscal '24 was the workloads that we acquired during the year in addition to those that we acquired in the year before . . . contributed to the stable growth that we saw in fiscal '24 relative to fiscal '23.").

describing the impact and execution of MongoDB's new go-to-market strategy;[10] (3) risk disclosure statements;[11] (4) statements regarding workload and customer acquisition;[12] and (5) statements about MongoDB's retention rates.[13]

---

[10] This category contains the following statements:  AC ¶ 83 ("Our ongoing new business success is due to the mission criticality of our platform; and sharp execution by our go-to-market teams, who are navigating a difficult selling environment by remaining laser-focused on our North Star, acquiring new workloads."); *id.* ¶ 89 ("So I would also have to say that our go-to-market channels have to really focus on and are doing a really good job on qualifying these opportunities, being able to separate customers who are serious versus customers who may be just wanting to kick the tires."); *id.* ¶ 94 ("And so our whole company is oriented around winning more workloads.  This is not just a go-to-market orientation, although importantly, it is a go-to-market orientation, and that's a change or that's a shift from winning a big multiyear contract."); *id.* ¶ 101 ("[W]e're innovating both on the product and go-to-market dimensions to accelerate workload acquisition."); *id.* ¶ 102 ("[P]ositions us better for the longer term by accelerating workload acquisition.  We are pleased with the impact these changes have had in the business in the first half of the year. Specifically, new workload acquisition has accelerated, especially within existing customers.  We believe that our efforts to reduce friction are resulting in more efficient growth, and we'll always look for ways to improve our go-to-market approach."); *id.* ¶ 106 (Mr. Gordon praised "[t]he sales team [in] hav[ing] done a good job" in "navigat[ing]" the macroeconomic environment "very effectively," stating that he was "really pleased with the results there."); *id.* ¶ 107 ("So that reduction or that removal of that friction based on the change in comp plans has really helped us accelerate the acquisition of new workloads."); *id.* ("[W]e're really pleased by the velocity of the workloads we're acquiring . . . over the years we should see that impact really show up."); *id.* ¶ 109 ("[I]t's been part of a multiyear effort to reduce friction in the process, which includes reducing the emphasis or the importance of commitments."); *id.* ("Amazingly, incentives drive behavior."); *id.* ("[A]nything we can do to effectively and synthetically expand the impact of that sales force by freeing up time and giving them time is valuable."); *id.* ("[C]omp plans are complicated, reps are sensitive to them.  You typically only change them once a year.  You're not usually changing comp plans midyear."); *id.* ¶ 115 ("[O]ver the last couple of years one of the things we've been trying to do is reduce friction for the sales force.  Some of that includes reducing the emphasis around upfront commitments.  And so that helps accelerate landing new workloads and things like that."); *id.* ¶ 122 (in responding to a question as to whether here was "anything to keep in mind" when comparing revenues between years implementing a commitment as compared to consumption model, "No, not really . . . we've learned a decent amount about change management and how to implement this and roll this out in fiscal year '24."); *id.* ("[A]nd it wasn't actually terribly disruptive, given the size of the change that it was not in terms of sales attrition or anything like that."); *id.* ("We also see it in the volume of new workloads, which is where we started the conversation and how good we feel about that.  But as you think about like what does that mean in terms of compares or mechanics of the financial model for next year, nothing particular to call out."); *id.* ¶ 125 ("[W]e continue to innovate on our go-to-market motion to drive workload acquisition.").

[11] This category contains the following statements:  AC ¶ 82 ("There is a risk that customers will consume our MongoDB Atlas offering more slowly than we expect, and our actual results may differ from our forecasts and our future revenue may be less predictable going forward due to, among other things, fluctuations in the rate of customer renewals and expansions and seasonality of, or fluctuations in, usage of MongoDB Atlas.")

[12] This category contains the following statements:  AC ¶ 82 ("Continued Strong Customer Growth"); *id.* ("[H]ighlighted by 40% Atlas revenue growth and the most net new customer additions in over two years.  The continued strength in new business activity indicates the mission criticality of the MongoDB developer data platform."); *id.* ¶ 83 ("Overall, we delivered a strong Q1.  We had a very healthy quarter of new business acquisition."); *id.* ("In fact, this quarter, we acquired a record number of new workloads from our existing customers."); *id.* ¶ 84 ("Our ability to win new workloads remained strong, and Atlas consumption trends were better than expected."); *id.* ¶ 85 ("[W]e continue to see a healthy new business environment both in terms of acquiring new customers as well as acquiring new workloads within existing customers . . . Our new business performance and strong total customer net additions demonstrate the continued demand for our developer data platform."); *id.* ¶ 89 ([W]e had a record number of new workloads added this quarter from existing customers."); *id.* ¶ 91 ("So when you hear us talk about our results, we talk about winning new customers. We talk about winning new workloads.  And that's really kind of the key thing."); *id.* ("[I]n the medium to long term, things are much more affected by are we winning new customers?  Are we continuing to add new workloads within existing customers and sort of penetrate there?"); *id.* ¶ 92 ("[C]ontinued to add significant numbers of new customers" and had its "strongest net additions in customer count this past quarter."); *id.* ¶ 100 ("Continued Strong Customer

### 7.   The Market Reacts to MongoDB's Adjusted Revenue Forecasts

On May 30, 2024, MongoDB announced that it expected to see reduced growth for the remainder of the year and lowered its forward-looking revenue forecasts.  *Id.* ¶ 167.  Lead Plaintiffs allege that market analysts were quick to attribute blame to the "slower growth from newly acquired workloads."  *Id.*  Following MongoDB's announcement, the price of MongoDB common stock declined by nearly 24% in less than a day.  *Id.* ¶ 169.

### B.  Procedural History

Lead Plaintiffs commenced this action on July 9, 2024, Dkt. No. 1, and filed the AC on January 27, 2025, Dkt. No. 60.  Lead Plaintiffs assert claims against MongoDB, Mr. Ittycheria, Mr.

---

Growth"); *id.* ("[C]ontinued strength in new workload acquisition."); *id.* ¶ 101 ("[W]e had another solid quarter of customer growth, ending the quarter with over 45,000 customers."); *id.* ("We had a healthy quarter of new business acquisition led by continued strength in new workload acquisition in our existing customers."); *id.* ("[W]e had another strong quarter of new business performance, which really validates our value proposition."); *id.* ¶ 102 ("We are highly focused on reducing friction in the sales process so we can acquire more workloads quickly and cost effectively given the large size of our market opportunity."); *id.* ¶ 103 ("[W]e continue to see a healthy new business environment especially in terms of acquiring new workloads within existing customers."); *id.* ¶ 106 ("[T]he new business environment has remained robust for [MongoDB] in terms of winning new workloads."); *id.* (MongoDB has "been able to successfully navigate the new macroeconomic environment" in "winning new workloads."); *id.* ¶ 110 (describing the "new business environment" as "robust" and that "throughout this macro slowdown that began over a year ago, we've been very happy with our ability to acquire new business."); *id.* ¶ 112 ("Continued Strong Customer Growth"); *id.* ("MongoDB continued to perform at a high level in the third quarter . . . .  We are pleased by our success in winning new Workloads."); *id.* ¶ 113 ("[H]ad a healthy quarter of new business acquisition led by continued strength in new workload acquisition within our existing customers."); *id.* ¶ 114 ("In terms of our direct sales net additions, new sales activity remains healthy."); *id.* ("We're pleased with our ability to win new business."); *id.* ¶ 116 ("[C]ustomers are increasingly viewing MongoDB as a mission-critical platform.  They're going to run more and more workloads on MongoDB."); *id.* ¶ 118 ("New Business environment continues to be strong for us in terms of getting new customer workloads, both from existing customers as well as logos."); *id.* ¶ 124 ("Continued Strong Customer Growth with Over 47,800 Customers as of January 31, 2024."); *id.* ("We continue to see healthy new workload wins."); *id.* ¶ 125 ("[W]e will remain singularly focused on new workload acquisition as a key long-term driver of our business.  We will continue fine-tuning incentives to ensure that our entire go-to-market organization is focused on identifying and sourcing new workload opportunities."); *id.* ("[W]e continue to innovate our go-to-market motion to drive workload acquisition."); *id.* ¶ 126 (MongoDB "has another quarter of healthy new business acquisition demonstrating [MongoDB's] product market fit and the mission criticality of [the] platform."); *id.* ¶ 127 ("I see stable consumption growth going to next year."); *id.* ("[W]e see stable growth—stable usage growth across our portfolio of workloads."); *id.* ¶ 129 ("[W]e expect Atlas consumption trends to be in line with the consumption growth we experienced in fiscal '24."); *id.* ¶ 129 ("[W]e see a stable environment."); *id.* ("We have seen more stable consumption that obviously gives us higher confidence in part, given the less variability that we've seen over the course of fiscal '24."); *id.* ¶ 130 ("I do think to the confidence point, I think that, that is correct.  We do have more confidence.  We have more data."); *id.* ("We saw more consistent results that does give us increased confidence.").

[13] This category contains the following statements:  AC ¶ 101 ("[R]etention rates remained strong in Q2, reinforcing the mission criticality of our platform."); *id.* ¶ 113 ("[R]etention rates remained strong in Q3, reinforcing the mission criticality of our platform."); *id.* ¶ 126 ("[R]etention rates remained strong though Q4," and "reinforce[d] the quality of our product and the mission criticality of our platform.").

Gordon, and Mr. Tanjga, for violating Section 10(b) of the Exchange Act and Rule 10b-5 by allegedly omitting material information about the performance of MongoDB's newly acquired workloads and the company's overall growth and performance following its decision to transition to a consumption-based pricing model.  AC ¶¶ 82–147.  Lead Plaintiffs also assert Section 20(a) claims against the Individual Defendants for exercising their control over MongoDB to induce the allegedly material omissions.  *Id.* ¶¶ 195–99.

On May 9, 2025, Defendants moved to dismiss the AC for failure to state a claim.  *See generally* Dkt. No. 73.  Defendants filed a memorandum of law in support of their motion that same day.  *See generally* Dkt. No. 74 ("Mem.").  Defendants filed twenty-eight exhibits in connection with their motion to dismiss, which they argue are either incorporated by reference into the complaint, integral to the complaint, or subject to judicial notice.  *See generally* Dkt. No. 75 ("Polubinski Decl.").  Lead Plaintiffs filed an opposition to the motion to dismiss on July 1, 2025.  *See generally* Opp'n.  Lead Plaintiffs filed three exhibits in connection with their opposition brief.  *See generally* Dkt. No. 77 ("Serra Decl.").  Defendants filed their reply on July 29, 2025.  Dkt. No. 79.

## III.    LEGAL STANDARDS

### A.  Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  However, a defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and draws all inferences in the plaintiff's favor.  *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 809–10 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase Grp. All. LLC v. City of N.Y Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010).  However, "the tenet that a

court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

Because claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder sound in fraud, they are subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act (the "PSLRA"). *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000). Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy that requirement, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citing *Novak*, 216 F.3d at 306). The PSLRA imposes similar requirements on claims brought under the Exchange Act: "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-

18

4(b)(1). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each alleged misstatement or omission. 15 U.S.C. § 78u-4(b)(2)(A). A complaint will survive under that heightened standard "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted). Furthermore, on a motion to dismiss, the Court can consider statements made in a company's public filings with the SEC. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). Here, in addition to factual allegations in Lead Plaintiffs' AC, the Court has also considered MongoDB's disclosure documents, public filings with the SEC, and the transcripts of the various conferences, workshops, and calls during which the challenged statements were made. However, the Court can consider them "'only to determine what the documents stated,' and 'not to prove the truth of their contents.'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Kramer*, 937 F.2d at 774).

### B. Section 10(b) and Rule 10b-5 Liability

Under Section 10(b) and Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in

the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b); *see also* 15 U.S.C. § 78j(b). To state a claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, a plaintiff must plausibly allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Invs., Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

## IV.    DISCUSSION

### A.  Actionable Material Misrepresentations or Omissions

#### 1.   Legal Standard

"'The test for whether a statement is materially misleading under Section 10(b) . . . is "whether the defendants' representations, taken together and in context, would have misled a reasonable investor."'" *City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc.*, 153 F.4th 288, 295 (2d Cir. 2025) (quoting *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2nd Cir. 2004) (quoting *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991))). "Whether a statement is false or misleading is 'evaluated not only by literal truth, but by context and manner of presentation.'" *Id.* (quoting *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019)).

When a company does not have an obligation to speak but does so anyway, it assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate" (quotation omitted)). And "literally true statements" are actionable if they "create a materially misleading impression . . . ." *SEC v. Gabelli*,

653 F.3d 49, 57 (2d Cir. 2011), *rev'd and remanded on other grounds*, 568 U.S. 442 (2013).  "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context."  *In re Morgan Stanley Info. Fund*, 592 F.3d at 366 (internal quotation marks omitted).  Accordingly, plaintiffs "may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud."  *Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony Fin. Sec. Litig.)*, 988 F.3d 157, 171 (2d Cir. 2021).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5[,]" *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988), but omissions can also be actionable under Section 10(b).  *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94 (2d Cir. 2015), *abrogated on other grounds by*, *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024) ("We have consistently held that 'an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.'") (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).

An omission is actionable if the omitted information was subject to "an affirmative legal disclosure obligation" or the omitted information is "necessary to prevent existing disclosures from being misleading."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715–16 (2d Cir. 2011); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011) ("Disclosure is required under these provisions only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading.").  "It bears emphasis that § 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all material information."  *Matrixx Initiatives, Inc.*, 563 U.S. at 44–45 (internal quotations and citations omitted).  There is no "generalized duty requiring defendants to disclose the entire corpus of their knowledge."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366.  And "[j]ust because 'a reasonable investor would very much like to know [a] fact' does not create any obligation to speak up."  *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers*

21

*Squibb Co.*, 28 F.4th 343, 363 (2d Cir. 2022) (quoting *Dalberth v. Xerox Corp.*, 766 F.3d 172, 183 (2d

Cir. 2014)).

The key is the "presence of a prior statement that otherwise is or will become materially

misleading" because of the omission. *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413

F. Supp. 3d 187, 206 (S.D.N.Y. 2019); *see also In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 171–

72 (S.D.N.Y. 2023) (concluding that statements that "addressed concepts distinct and afield from

the fact omitted" did not give rise to a duty to disclose the allegedly omitted information). As

relevant to this case, "[t]o be actionably misleading, there must be a sufficiently close nexus between

the statement and the allegedly omitted information." *Buhrke Fam. Revocable Tr. v. U.S. Bancorp*, 726

F. Supp. 3d 315, 340 (S.D.N.Y. 2024) (internal citations and quotations omitted). "In determining

whether there is a duty to disclose omitted information, 'the critical consideration is whether "the

alleged omissions are sufficiently connected to defendants' existing disclosures to make those public

statements misleading."'" *Diehl v. Omega Protein Corp.*, 339 F. Supp. 3d 153, 165 (S.D.N.Y. 2018)

(citation modified) (quoting *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) (quoting

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469 (S.D.N.Y. 2006))); *see also In re*

*Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d 169, 188 (W.D.N.Y. 2022) (same).

"Where there is no such connection, there is no viable claim based on the alleged omission."

*In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d at 188. This is because "statements lacking such a

nexus would not mislead a reasonable investor, as the investor would have no basis to infer anything

regarding the allegedly omitted information absent the requisite nexus." *Buhrke Fam. Revocable Tr.*,

726 F. Supp. 3d at 346. "In other words, the subject matter of the alleged statement must relate

closely enough to the allegedly omitted information such that a reasonable investor might have

drawn inferences about the omitted information because of the statement." *Buhrke Fam. Revocable*

*Tr.*, 726 F. Supp. 3d at 340; *Diabat v. Credit Suisse Grp. AG*, No. 23 CIV. 5874, 2024 WL 4252502, at *9 (S.D.N.Y. Sept. 19, 2024) (same).

To incur liability, misrepresentations or omissions must be material.  An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Levinson*, 485 U.S. at 240 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotation marks omitted).  "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Caiola*, 295 F.3d at 329 (internal quotation marks and citation omitted).

### i.    Statements of Opinion

"[S]ubjective statements of opinion are generally not actionable as fraud." *Afr. v. Jianpu Tech. Inc.*, 2022 WL 4537973, at *5 (S.D.N.Y. Sept. 28, 2022) (quoting *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015*), aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)).  The Supreme Court has emphasized that it is "no small task for an investor" to meet the standard for pleading an actionable statement of opinion. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).

Nonetheless, "[s]tatements of opinion are actionable if (1) the speaker did not hold the belief she professed, (2) the supporting facts she supplied were untrue, or (3) the speaker omitted information whose omission makes the statement misleading to a reasonable investor." *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 43 (2d Cir. 2025), *cert. denied sub nom. Shanda Games Ltd. v. Monk*, 146 S. Ct. 366, 223 L. Ed. 2d 196 (2025) (internal citations, quotations, and alterations omitted); *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 40 (2d Cir. 2024), *cert. denied sub nom. BDO USA, LLP v. New England Carpenters Guaranteed Annuity & Pension Funds*, 146 S.

23

Ct. 261 (2025); *see Tongue*, 816 F.3d at 209–10 (applying *Omnicare* to claims arising under Section 10(b) and Rule 10b-5). "In other words, when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should know of different material facts that were omitted, liability under Rule 10b-5 may follow." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020). With respect to the second basis for challenging a statement of opinion, a plaintiff must show that "the embedded fact is not one as to which reasonable minds can differ." *New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 42. And "[w]ith respect to th[e] [third] basis for challenging a statement of opinion, *Omnicare* held that the appropriate perspective for identifying whether a statement of opinion implies facts is that of the reasonable investor." *Id.* That is because a reasonable investor "expects not just that [the speaker] believes the opinion (however irrationally), *Omnicare*, 575 U.S. at 189, but that it "rests on some meaningful . . . inquiry," "fairly aligns with the information in the issuer's possession at the time," and does not "reflect baseless, off-the-cuff judgments." *New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 41 (citation modified) (quoting *Omnicare*, 575 U.S. at 188–90).

"In assessing what a reasonable investor would expect, the Supreme Court stressed the importance of context, such as 'the customs and practices of the relevant industry' and whether the opinion was expressed in a formal statement such as an S.E.C. filing or instead was a 'baseless, off-the-cuff judgment[], of the kind that an individual might communicate in daily life.'" *Abramson*, 965 F.3d at 175 (quoting *Omnicare*, 575 U.S. at 190) (alterations in *Abramson*). "Finally, . . . '[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts' and thus that a statement of opinion does not imply false information to a reasonable investor simply because there is 'some fact cutting the other way' that the speaker omitted." *Id.* (quoting *Omnicare*, 575 U.S. at 190). Thus, a statement of opinion "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way." *Id.* (quoting *Omnicare*, 575 U.S. at 194). The "core

24

inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 575 U.S. at 194).

As a threshold question, the Court must determine whether a statement is one of fact or of opinion under the federal securities law. *New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 40. "In general, a fact is 'a thing done or existing or an actual happening,' while an opinion is 'a belief, a view, or a sentiment which the mind forms of persons or things.'" *Id.* (quoting *Omnicare*, 575 U.S. at 183). A statement of fact 'expresses certainty about a thing,' while a statement of opinion does not." *Id.* (quoting *Omnicare*, 575 U.S. at 183). "Statements of opinion often include qualifying language (like 'I believe' or 'I think') that conveys a lack of certainty about the thing being expressed, marks the statement as reflecting the speaker's impression or point of view rather than an objective truth, and makes it easier to identify the statement as one of opinion rather than fact." *Id.* at 40–41 (quoting *Omnicare*, 575 U.S. at 183–84).

"But not all statements of opinion include such qualifying language." *Id.* at 41. Rather, "[c]ertain statements address issues so plainly subjective, . . . that the statement is one of opinion not just by virtue of the words used but also because of the nature of the information conveyed." *Id.* The "inquiry [] turn[s] on whether the relevant statement reflects the speaker's determination of 'a matter of objective fact' or instead expresses the speaker's judgment about a matter that lacks 'any objective standard,'" the "latter statement . . . is 'inherently subjective.'" *Id.* (quoting *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 109–10, 113 (2d Cir. 2011)). An opinion is "a statement [that] turns on the exercise of subjective judgment." *Id.* And "opinions lead double lives"—a statement of "opinion may implicitly convey 'facts about how the speaker has formed the opinion [] or . . . about the speaker's basis for holding that view." *Id.*

### ii.    Corporate Optimism and Puffery

General statements of optimism and puffery are nonactionable under federal securities laws "because these 'vague descriptions' . . . are too general to cause a reasonable investor to rely upon them." *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408 (2d Cir. 2023) (concluding that characterizations of study methodology as "rigorous," "extensive," "thorough," "systematic," "unique in . . . completeness and transparency," "the best science," and "very advanced" "are precisely the type of puffery that [we] have consistently held to be inactionable"); *see also Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 29 (S.D.N.Y. 2016) (noting that statements of optimism and puffery are not "sufficiently specific [such] that a reasonable investor could rely on [them] as a 'guarantee of some concrete fact or outcome'" (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014))).

Puffery comes in two types.  "The first category of puffery encompasses 'subjective statements of opinion which cannot be proven false.'" *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 96 (2d Cir. 2023) (discussing puffery under New York law pursuant to New York General Business law §§ 349 and 350) (quoting *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 60 (2d Cir. 2022)).  "This form of puffery encompasses 'subjective statements . . . which cannot be proven false.'" *Id.* (quoting *Int'l Code Council, Inc.*, 43 F.4th at 60).  It "often manifests as exaggerations or overstatements that mention nothing specific, but rather amount to general claims of superiority expressed in broad, vague, and commendatory language." *Id.* (internal quotations omitted) (quoting *Int'l Code Council, Inc.*, 43 F.4th at 59–60).  "The second type of puffery involves exaggerated, blustering, and boasting statements that are objective—and therefore technically provable—but upon which no reasonable buyer would be justified in relying." *Id.* (internal quotations omitted) (quoting *Int'l Code Council, Inc.*, 43 F.4th at 59–60).  "Even if a claim is provable

26

as false, if it is so patently hyperbolic" that it could not mislead a reasonable investor, it is non-actionable puffery.  *Id.*

"General statements about reputation, integrity, and compliance with ethical norms are inactionable puffery."  *Singh*, 918 F.3d at 63.  So too are "[v]ague positive statements regarding a corporate entity's risk-management strategy, asset quality, and business practices are too general to cause a reasonable investor to rely upon them and therefore are precisely the type of puffery that this and other circuits have consistently held to be inactionable."  *Sherman v. Abengoa, S.A.*, 156 F.4th 152, 164 (2d Cir. 2025) (citation modified) (concluding that "statements regarding [defendant's] 'strict financial discipline' and 'robust' systems" were nonactionable); *In re Vale S.A. Sec. Litig.*, No. 1:15-cv-9539, 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017) (statements regarding "what [the defendant] is 'seeking' to do, what it is 'committed' to doing, what it is 'focused on,' what it is 'aiming' to do, and what its 'priorities' are" were non-actionable).  Even "misguided optimism is not a cause of action, and does not support an inference of fraud" because the Second Circuit has "rejected the legitimacy of 'alleging fraud by hindsight.'"  *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (quoting *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978)).  Allegations that a defendant should have been "more alert and more skeptical" are insufficient; speakers are "not required to take a gloomy, fearful or defeatist view of the future . . . ."  *Id.* at 1129–30.

However, like opinion statements, statements of optimism and puffery can be actionable where they are "determinate and verifiable," *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 418, and they "contradict facts that are known to a defendant," *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016), or where they amount to "'misrepresentations of existing facts' that were made even though the speaker 'knew that the contrary was true,'" *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 298 (S.D.N.Y. 2018) (quoting *Novak*, 216 F.3d at 315).

27

A plaintiff must "point to an[] objective, black-and-white-standard by which to verify" whether the challenged statement is untrue.  *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 418.

### iii.    Forward-Looking Statements

"Two doctrines—one statutory, the other judge-made—protect certain forward-looking statements from serving as the basis for claims of securities fraud."  *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 396 (S.D.N.Y. 2020).  "First, the PSLRA creates a statutory 'safe harbor' for certain statements."  *Id.*  "Second, courts have long protected forward-looking statements, under the bespeaks-caution doctrine."  *Id.*

The PSLRA includes several definitions of forward-looking statements.  *See* 15 U.S.C. § 78u–5(i)(1)(A)–(C).  Under the safe-harbor provision, "a defendant is not liable if (1) 'the forward-looking statement is identified and accompanied by meaningful cautionary language,' (2) the forward-looking statement 'is immaterial,' or (3) 'the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading.'"  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010)).  "Because '[t]he safe harbor is written in the disjunctive,' a forward-looking statement is protected under the safe harbor if any of the three prongs applies.'"  *Id.* at 245–46 (quoting *Slayton*, 604 F.3d at 766).  However, the Second Circuit has held that "'[a] statement may contain some elements that look forward and others that do not,' and 'forward-looking elements' may be 'severable' from 'non-forward-looking' elements."  *Id.* (quoting *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010)); *see also Makor Issues & Rts, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.").

However, there are limits to the safe harbor's reach.  "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their

cautionary language was not boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at 772; *see also City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 301 (S.D.N.Y. 2013) ("[G]eneric and mere boilerplate words of caution—for example, a statement at the beginning of a conference call that states merely that 'forward-looking statements are subject to certain risks and uncertainties'—are insufficient to put investors on notice of the risks at hand and therefore to inoculate these statements.") (quoting *Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 265 n.3 (2d Cir. 2010) (summary order))). Because "[c]autionary language in securities offerings is just about universal[,]" "the key question a district court must decide when determining whether to grant a motion to dismiss a securities fraud complaint is whether plaintiffs have overcome the existence of such language. Plaintiffs may do this by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Halperin v. eBanker USA.com*, 295 F.3d 352, 359 (2d Cir. 2002). The Court must evaluate the language "on a case-by-case basis. In all cases, however, the court must keep in mind that a complaint fails to state a claim of securities fraud if no reasonable investor could have been misled about the nature of the risk when he invested." *Id.*

The judicially created "bespeaks-caution doctrine is a corollary of 'the well-established principle that a statement or omission must be considered in context.'" *Iowa Pub. Emps. Ret. Sys.*, 620 F.3d at 141 (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir. 1996)). The doctrine provides that a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Id.*; *accord Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 235 (S.D.N.Y. 2006) ("Pursuant to the judicially-created 'bespeaks caution' doctrine, certain alleged misrepresentations, which are accompanied by meaningful cautionary statements, are considered immaterial as a matter

of law."). "In such circumstances, it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency." *Id.*

"To apply [the doctrine], however, the cautionary language must pertain to the specific risk that was realized." *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 398 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018). "'[C]autionary language [that] did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss' is insufficient." *Id.* (quoting *Halperin*, 295 F.3d at 357). And "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173 (citing *In re Prudential Secs. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.")); *see also Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021).

Thus, "[w]hen there is cautionary language in the disclosure, the Court analyzes 'the allegedly fraudulent materials in their entirety to determine whether a reasonable investor would have been misled. The touchstone of the inquiry is not whether isolated statements within a document were true, but whether defendants' representations or omissions, considered together and in context, would affect the total mix of information and thereby mislead a reasonable investor regarding the nature of the securities offered.'" *Rombach*, 355 F.3d at 173–74 (quoting *Halperin*, 295 F.3d at 357).

2.  **Application**

i.  **Some, But Not All, of the Challenged Statements Are Not Actionable Opinion Statements or Puffery**

Some of the statements alleged to have been misleading by omission are not actionable because they are either puffery or are statements of opinion which are not rendered misleading by the omission of information about the FY 2024 newly acquired workloads' consumption rate.[14]

---

[14] The challenged statements that are nonactionable because they are either puffery or non-misleading opinion statements (or both) are:  AC ¶ 82 ("Continued Strong Customer Growth"); *id.* ("The continued strength in new business activity indicates the mission criticality of the MongoDB developer data platform."); *id.* ¶ 83 ("Overall, we delivered a strong Q1.  We had a very healthy quarter of new business acquisition."); *id.* ("Our ongoing new business success is due to the mission criticality of our platform; and sharp execution by our go-to-market teams, who are navigating a difficult selling environment by remaining laser-focused on our North Star, acquiring new workloads."); *id.* ¶ 84 ("Our ability to win new workloads remained strong."); *id.* ("Atlas consumption trends were better than expected."); *id.* ¶ 85 ("[W]e continue to see a healthy new business environment both in terms of acquiring new customers as well as acquiring new workloads within existing customers . . . Our new business performance and strong total customer net additions demonstrate the continued demand for our developer data platform."); *id.* ¶ 87 ([W]e also just don't focus on acquiring but also making sure they're onboarded properly; they're serviced properly so that those workloads grow well."); *id.* ("The only way we can really influence that is, over the long term, by acquiring more and more workloads either [] from existing customers or acquiring new customers.  And so we're really focused on what we can control, which is all about acquiring new customers and new workloads."); *id.* ("[T]hat's ultimately the things we can control and that's what we're really focused on."); *id* ¶ 89 ("So I would also say that our-go-to-market channels have to really focus on and are doing a really good job on qualifying these opportunities, being able to separate customers who are serious versus customers who may be just wanting to kick the tires."); *id.* ¶ 91 ("So when you hear us talk about our results, we talk about winning new customers.  We talk about winning new workloads.  And that's really kind of the key thing."); *id.* ("[I]n the medium to longer term, things are much more affected by are we winning new customers?  Are we continuing to add new workloads within existing customers and sort of penetrate there?"); *id.* ¶ 94 ("[I]nitial workload grows—the first couple of years tend to be where there's the fastest growth, but the workload is still continu[ing] to grow for many, many years."); *id.* ("[T]he way that we really grow within the account is winning additional workloads."); *id.* ("But over time, the way you grow within the account is adding new workloads."); *id.* ¶ 95 ("In the long term, though, Atlas growth is driven by our ability to acquire new workloads.  That's really the key thing because new workloads, in the long run, will drive most of the growth."); *id.* ("And the reality is the new workloads that you add over that subsequent workload wind up being responsible for the vast majority of the incremental growth."); *id.* ¶ 100 ("Continued Strong Customer Growth."); *id.* ("[C]ontinued strength in new workload acquisition."); *id.* ¶ 101 ("[W]e're innovating both on the product and go-to-market dimensions to accelerate workload acquisition."); *id.* ("[W]e had another solid quarter of customer growth."); *id.* ("We had a healthy quarter of new business acquisition led by continued strength in new workload acquisition in our existing customers."); *id.* ("[W]e had another strong quarter of new business performance, which really validates our value proposition."); *id.* ("[R]etention rates remained strong in Q2, reinforcing the mission criticality of our platform."); *id.* ¶ 102 ("[P]ositions us better for the longer term by accelerating workload acquisition.  We are pleased with the impact these changes have as in the business in the first half of the year.  Specifically, new workload acquisition has accelerated, especially within existing customers.  We believe that our efforts to reduce friction are resulting in more efficient growth, and we'll always look for ways to improve our go-to-market approach."); *id.* ¶ 103 ("[W]e continue to see a healthy new business environment especially in terms of acquiring new workloads within existing customers."); *id.* ¶ 106 (Mr. Gordan praised "[t]he sales teams [in] hav[ing] done a good job" in "navigat[ing]" the macroeconomic environment "very effectively," stating that he was "really pleased with the results there."); *id.* ("[T]he new business environment has remained robust."); *id.* (MongoDB had "been able to successfully navigate the macroeconomic environment" in "winning new workloads."); *id.* ¶ 107 ("So that reduction or that removal of that friction based on the change in comp plans has really helped us accelerate the acquisition of new workloads."); *id.* ("[W]e're really pleased by the velocity of the workloads we're acquiring . . . over the years we should see that impact really show up."); *id.* ¶ 109 ("[A]nything we can do to effectively and synthetically expand the impact of that sales force

by freeing up time and giving them time is valuable."); *id.* ("Amazingly, incentives drive behavior."); *id.* ("[C]omp plans are complicated, reps are sensitive to them. You typically only change them once a year. You're not usually changing comp plans midyear."); *id.* ¶ 110 ("[W]hat we've particularly become more comfortable over time is our ability to call when we see that there's incremental workload potential in the account."); *id.* (describing the "new business environment" as "robust" and noting that "throughout this macro slowdown that began over a year ago, we've been very happy with our ability to acquire new business."); *id.* ¶ 112 ("Continued Strong Customer Growth."); *id.* ("MongoDB continued to perform at a high level in the third quarter."); *id.* ("We are pleased by our success in winning new workloads."); *id.* ¶ 113 (MongoDB "had a healthy quarter of new business acquisition led by continued strength in new workload acquisition."); *id.* ("[R]etention rates remained strong in Q3, reinforcing the mission criticality of our platform."); *id.* ¶ 114 ("We are pleased with our ability to win new business."); *id.* ("In terms of our direct sales net additions, new sales activity remained healthy."); *id.* ¶ 115 ("[O]ver the last couple of years one of the things we've been trying to do is reduce friction for the sales force. Some of that includes reducing the emphasis around upfront commitments. And so that helps accelerate landing new workloads and things like that."); *id.* ¶ 116 ("[C]ustomers are increasingly viewing MongoDB as a mission-critical platform . . . They're going to run more and more workloads on MongoDB."); *id.* ¶ 118 ("We continue to see growth of existing customers and existing workloads grow healthfully."); *id.* ("New business environment continues to be strong for us in terms of getting new workloads, both from existing customers as well as logos."); *id.* ¶ 119 ("We spend a tremendous amount of time focusing on . . . 'Are we acquiring new workloads? Are we doing that if they are the same quality or better than what we've done in the past?'"); *id.* ¶ 124 ("Continued Strong Customer Growth with Over 47,800 Customers as of January 31, 2024."); *id.* ("We continue to see healthy new workload wins."); *id.* ¶ 125 ("[W]e continue to innovate on our go-to-market motion to drive workload acquisition."); *id.* ¶ 126 (MongoDB "had another quarter of healthy new business acquisition demonstrating [MongoDB's] product market fit and the mission criticality of [the] platform."); *id.* ("[R]etention rates" remained strong through Q4, which "reinforce[d] the quality of our product and the mission criticality of our platform."); *id.* ¶ 127 ("I see stable consumption growth going to next year."); *id.* ("[W]e see stable growth—stable usage growth across our portfolio of workloads."); *id.* ¶ 128 ("I remain highly confident about our ability to execute on our long-term growth opportunity."); *id.* ¶ 129 ("[W]e see a stable environment."); *id.* ("We have seen more stable consumption that obviously gives us higher confidence in part, given the less variability that we've seen over the course of fiscal '24."); *id.* ¶ 130 ("I do think to the confidence point, I think that, that is correct. We do have more confidence. We have more data."); *id.* ("We saw more consistent results that does give us increased confidence."); *id.* ¶ 134 ("[W]hat that meant in fiscal '24 was the workloads that we acquired during the year in addition to those that we acquired in the year before . . . contributed to the stable growth that we saw in fiscal '24 relative to fiscal '23.").

32

First, some,[15] but not all, of the challenged statements are statements of opinion.  Some of the challenged statements[16] are clearly signaled as statements of opinion because they include

---

[15] The challenged statements which are statements of opinion are:  AC ¶ 83 ("Our ongoing new business success is due to the mission criticality of our platform; and sharp execution by our go-to-market teams, who are navigating a difficult selling environment by remaining laser-focused on our North Star, acquiring new workloads."); *id* ¶ 84 ("Our ability to win new workloads remained strong, and Atlas consumption trends were better than expected."); *id* ¶ 89 ("So I would also say that our-go-to-market channels have to really focus on and are doing a really good job on qualifying these opportunities, being able to separate customers who are serious versus customers who may be just wanting to kick the tires."); *id.* ¶ 91 ("So when you hear us talk about our results, we talk about winning new customers.  We talk about winning new workloads.  And that's really kind of the key thing."); *id.* ("[I]n the medium to longer term, things are much more affected by are we winning new customers?  Are we continuing to add new workloads within existing customers and sort of penetrate there?"); *id.* ¶ 94 ("[I]nitial workload grows—the first couple of years tend to be where there's the fastest growth, but the workload is still continu[ing] to grow for many, many years."); *id.* ("[T]he way that we really grow within the account is winning additional workloads."); *id.* ("But over time, the way you grow within the account is adding new workloads."); *id.* ¶ 95 ("In the long term, though, Atlas growth is driven by our ability to acquire new workloads.  That's really the key thing because new workloads, in the long run, will drive most of the growth."); *id.* ("And the reality is the new workloads that you add over that subsequent workload wind up being responsible for the vast majority of the incremental growth."); *id.* ¶ 102 ("[P]ositions us better for the longer term by accelerating workload acquisition.  We are pleased with the impact these changes have as in the business in the first half of the year.  Specifically, new workload acquisition has accelerated, especially within existing customers.  We believe that our efforts to reduce friction are resulting in more efficient growth, and we'll always look for ways to improve our go-to-market approach."); *id.* ¶ 106 (Mr. Gordan praised "[t]he sales teams [in] hav[ing] done a good job" in "navigat[ing]" the macroeconomic environment "very effectively," stating that he was "really pleased with the results there."); *id.* ¶ 107 ("So that reduction or that removal of that friction based on the change in comp plans has really helped us accelerate the acquisition of new workloads."); *id.* ("[W]e're really pleased by the velocity of the workloads we're acquiring . . . over the years we should see that impact really show up."); *id.* ¶ 109 ("[A]nything we can do to effectively and synthetically expand the impact of that sales force by freeing up time and giving them time is valuable."); *id.* ("[C]omp plans are complicated, reps are sensitive to them.  You typically only change them once a year.  You're not usually changing comp plans midyear."); *id.* ¶ 110 ("[W]hat we've particularly become more comfortable over time is our ability to call when we see that there's incremental workload potential in the account."); *id.* ("[T]hroughout this macro slowdown that began over a year ago, *we've been very happy* with our ability to acquire new business."); *id.* ¶ 112 ("We are pleased by our success in winning new workloads."); *id.* ¶ 114 ("We are pleased with our ability to win new business."); *id.* ¶ 115 ("[O]ver the last couple of years one of the things we've been trying to do is reduce friction for the sales force.  Some of that includes reducing the emphasis around upfront commitments.  And so that helps accelerate landing new workloads and things like that."); *id.* ¶ 116 ("They're going to run more and more workloads on MongoDB."); *id.* ¶ 119 ("We spend a tremendous amount of time focusing on . . . 'Are we acquiring new workloads?  Are we doing that if they are the same quality or better than what we've done in the past?'"); *id.* ¶ 122 (in responding to a question as to whether here was "anything to keep in mind" when comparing revenues between years implementing a commitment as compared to consumption model, "No, not really . . . we've learned a decent amount about change management and how to implement this and roll this out in fiscal year '24."); *id.* ("We also see it in the volume of new workloads, which is where we started the conversation and how good we feel about that.  But as you think about like what does that mean in terms of compares or mechanics of the financial model for next year, nothing particular to call out."); *id.* ¶ 127 ("I see stable consumption growth going to next year."); *id.* ("[W]e see stable growth—stable usage growth across our portfolio of workloads."); *id.* ¶ 128 ("I remain highly confident about our ability to execute on our long-term growth opportunity."); *id.* ¶ 129 ("I think the key thing is, once you adjust for those onetime items that we called out, we see a stable environment."); *id.* ("We have seen more stable consumption that obviously gives us higher confidence in part, given the less variability that we've seen over the course of fiscal '24."); *id.* ("[W]e see a stable environment."); *id.* ¶ 130 ("I do think to the confidence point, I think that, that is correct.  We do have more confidence.  We have more data."); *id.* ("We saw more consistent results that does give us increased confidence.").

[16] The challenged statements which are statements of opinion because they expressly include "qualifying language" identifying them as such are: AC ¶ 84 ("I *am pleased with* our first quarter results . . . Our ability to win new workloads remained strong, and Atlas consumption trends were better than expected."); *id* ¶ 89 ("So *I would also say* that our-go-to-market channels have to really focus on and are doing a really good job on qualifying these opportunities, being able to

33

"qualifying language . . . that conveys a lack of certainty about the thing being expressed[] [and] marks the statement as reflecting the speaker's impression or point of view rather than an objective truth." *New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 40–41 (quoting *Omnicare*, 575 U.S. at 183–84). Lead Plaintiffs challenge a number of statements that include qualifying language clearly signaling that the statements are expressions of opinion, among them statements in which MongoDB executives expressed what they "think," that they were "very happy with" and "pleased with" MongoDB's success, that MongoDB's executives "believed" that "efforts to reduce friction are resulting in more efficient growth," that MongoDB's executives "remain highly confident" about the company's "ability to execute on [it's] long-term growth opportunity," that MongoDB's executives had "become more comfortable" in judging workload potential over time, and statements in which executives expressed their impressions or views as to what they "see" or "saw." *See e.g.*, AC ¶¶ 110, 112, 127, 128, 130.

For example, Lead Plaintiffs challenge Mr. Gordon's September 6, 2023 statement in which he opined that he was "really pleased with" the sales teams' results and commended the sales teams for doing a "good job" in identifying new workload opportunities while "navigat[ing] [the

---

separate customers who are serious versus customers who may be just wanting to kick the tires."); *id.* ¶ 102 ("[P]ositions us better for the longer term by accelerating workload acquisition. *We are pleased* with the impact these changes have as in the business in the first half of the year. Specifically, new workload acquisition has accelerated, especially within existing customers. *We believe* that our efforts to reduce friction are resulting in more efficient growth, and we'll always look for ways to improve our go-to-market approach."); *id.* ¶ 106 (Mr. Gordan praised "[t]he sales teams [in] hav[ing] done a good job" in "navigat[ing]" the macroeconomic environment "very effectively," stating that he was "*really pleased* with the results there."); *id.* ¶ 107 ("[W]e're *really pleased* by the velocity of the workloads we're acquiring . . . over the years we should see that impact really show up.") *id.* ¶ 110 ("[W]hat we've particularly *become more comfortable* over time is our ability to call when we see that there's incremental workload potential in the account."); *id.* ("[T]hroughout this macro slowdown that began over a year ago, *we've been very happy* with our ability to acquire new business."); *id.* ¶ 112 ("*We are pleased* by our success in winning new workloads."); *id.* ¶ 114 ("*We are pleased* with our ability to win new business."); *id.* ¶ 127 ("*I see* stable consumption growth going to next year."); *id.* ("[W]e *see* stable growth—stable usage growth across our portfolio of workloads."); *id.* ¶ 122 ("We also *see* it in the volume of new workloads, which is where we started the conversation and *how good we feel* about that. But as you think about like what does that mean in terms of compares or mechanics of the financial model for next year, nothing particular to call out."); *id.* ¶ 128 ("*I remain highly confident* about our ability to execute on our long-term growth opportunity."); *id.* ¶ 129 ("*I think* the key thing is, once you adjust for those onetime items that we called out, *we see* a stable environment."); *id.* ("We *have seen* more stable consumption that obviously *gives us higher confidence* in part, given the less variability *that we've seen* over the course of fiscal '24."); *id.* ("[W]e *see* a stable environment."); *id.* ¶ 130 ("I *do think* to the confidence point, I *think* that, that is correct. We do have more confidence. We have more data.").

macroeconomic environment] very effectively." *Id.* ¶ 106.  Lead Plaintiffs also challenge Mr.

Ittycheria's August 31, 2023 statement in which he expressed that he was "pleased with" and

"believed" that MongoDB's efforts to change its incentive plans to encourage sales representatives

to focus on volume of acquisition rather than securing large, up-front commitments "positions us

better for the longer term." *Id.* ¶ 102.  Both example statements, read in context, are clearly signaled

as statements of opinion because they include qualifying language—"pleased with" and "believed"—

that "marks the statement as reflecting the speaker's impression or point of view."[17]  *New England*

*Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 40–41 (quoting *Omnicare*, 575 U.S. at 183–

84).

　　And some of the challenged statements[18]—while they do not include express qualifying

language—are statements of opinion nonetheless given "the nature of the information conveyed."

---

[17] Lead Plaintiffs argue that many of the statements discussed herein are not statements of opinion because they are premised on verifiable facts that underlie the speaker's opinion. *See e.g.*, Dkt. No. 77-1 at 10.  But the Second Circuit has made clear that "opinions lead double lives"—and while a statement of "opinion may implicitly convey 'facts about how the speaker has formed the opinion [] or . . . about the speaker's basis for holding that view'" any such inclusion does not transform a statement of opinion into a statement of fact. *New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 41.

[18] The challenged statements which are statements of opinion because they are plainly subjective are:  AC ¶ 83 ("Our ongoing new business success is due to the mission criticality of our platform; and sharp execution by our go-to-market teams, who are navigating a difficult selling environment by remaining laser-focused on our North Star, acquiring new workloads."); *id.* ¶ 91 ("So when you hear us talk about our results, we talk about winning new customers.  We talk about winning new workloads.  And that's really kind of the key thing."); *id.* ("[I]n the medium to longer term, things are much more affected by are we winning new customers?  Are we continuing to add new workloads within existing customers and sort of penetrate there?"); *id.* ¶ 94 ("[I]nitial workload grows—the first couple of years tend to be where there's the fastest growth, but the workload is still continu[ing] to grow for many, many years."); *id.* ("But over time, the way you grow within the account is adding new workloads."); *id.* ¶ 95 ("In the long term, though, Atlas growth is driven by our ability to acquire new workloads.  That's really the key thing because new workloads, in the long run, will drive most of the growth."); *id.* ("And the reality is the new workloads that you add over that subsequent workload wind up being responsible for the vast majority of the incremental growth."); *id.* ¶ 107 ("So that reduction or that removal of that friction based on the change in comp plans has really helped us accelerate the acquisition of new workloads."); *id.* ¶ 109 ("[A]nything we can do to effectively and synthetically expand the impact of that sales force by freeing up time and giving them time is valuable."); *id.* ("[C]omp plans are complicated, reps are sensitive to them.  You typically only change them once a year.  You're not usually changing comp plans midyear."); *id.* ¶ 115 ("[O]ver the last couple of years one of the things we've been trying to do is reduce friction for the sales force.  Some of that includes reducing the emphasis around upfront commitments.  And so that helps accelerate landing new workloads and things like that."); *id.* ¶ 116 ("They're going to run more and more workloads on MongoDB."); *id.* ¶ 119 ("We spend a tremendous amount of time focusing on . . . 'Are we acquiring new workloads?  Are we doing that if they are the same quality or better than what we've done in the past?'"); *id.* ¶ 122 (in responding to a question as to whether here was "anything to keep in mind" when comparing revenues between years implementing a commitment as compared to consumption model, "No, not really . . . we've learned a decent amount about change management and how to implement this and roll this out in fiscal year '24."); *id.* ¶ 129 ("We have seen more stable consumption that obviously gives us higher confidence in part, given

*New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 41 (quoting *Fait*, 655 F.3d at 109–10, 113). These statements[19] "turn[] on the exercise of subjective judgment" about "matter[s] that lack[] 'any objective standard'": the beliefs that informed MongoDB's strategic choices and beliefs that MongoDB's operations and sales teams are, or will be, successful. *Id.* Read in the context in which they appear, the statements include language that signals both the exercise of subjective judgment and the absence of any objective benchmarks, like: "sharp execution," "effectively and synthetically," "tremendous," "the key thing," and "doing a really good job." Such language is qualitative not quantitative and subject to a host of reasonable, but nonetheless subjective, interpretations.

For example, Mr. Gordon's statement during the June 22, 2023 MongoDB Investor Session that "[in] the long term, though, Atlas growth is driven by our ability to acquire new workloads. That's really the key thing because new workloads, in the long run, will drive most of the growth," AC ¶ 95, is an opinion statement because Mr. Gordon was expressing his point of view as to how MongoDB can ensure its business operations remain successful moving forward. And there is no objective benchmark to evaluate what "the key thing" is to ensure continued Atlas growth. *Id.*; *see also id.* ¶ 91 ("We talk about winning new workloads. And that's really kind of the key thing."). Rather, what "the key" is to MongoDB's growth "is a matter of perspective and degree." *Buhrke Fam. Revocable Tr.*, 726 F. Supp. 3d at 349. And Mr. Gordon's September 7, 2023 statement that "anything we can do to effectively and synthetically expand the impact of the sales force by freeing up time and giving them time is valuable," AC ¶ 95, expresses Mr. Gordon's belief as to what is "valuable," which is premised entirely on his subjective judgment. Again, there is no metric for evaluating whether a given strategy would "effectively and synthetically expand the impact of

---

the less variability that we've seen over the course of fiscal '24."); *id.* ¶ 130 ("We saw more consistent results that does give us increased confidence.").

[19] *See supra* note 18 (identifying the opinion statements that are "plainly subjective").

[MongoDB's] sales force—this too, is "'inherently subjective.'" *New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 41 (quoting *Fait*, 655 F.3d 105, 109–10, 113).

But Lead Plaintiffs assert that, even if some of the challenged statements are opinions,[20] they are nonetheless actionable opinions because the statements omitted the fact that the FY 2024 workloads were not consuming as expected and the omission of that information made the statement misleading to a reasonable investor.[21] *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th at 43. That is not a fair reading of many of the opinion statements in context. Rather, some,[22] but not all,

---

[20] *See supra* note 15 (identifying challenged statements which are statements of opinion).

[21] Lead Plaintiffs contend that many of the statements discussed herein are actionable opinion statements for the same reason that they contend that the statements are not opinions at all—because underlying the speaker's opinion is the implied, embedded fact that the FY 24 workloads were consuming in line with historical rates. *See e.g.*, Dkt. No. 77-1 at 10. For the same reason stated above, this argument is not persuasive—the existence of some fact underlying an opinion statement does not transform a statement of opinion into a factual statement. Again, "opinions lead double lives"—and while a statement of "opinion may implicitly convey 'facts about how the speaker has formed the opinion [] or . . . about the speaker's basis for holding that view" any such inclusion does not transform a statement of opinion into a statement of fact. *New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 41. In any event, a reasonable investor would not read some of the opinion statements to imply this embedded fact for the reasons discussed herein.

[22] The statements of opinion which are not rendered misleading by any omission of information as to the FY 2024 new workloads' consumption rate are: AC ¶ 83 ("Our ongoing new business success is due to the mission criticality of our platform; and sharp execution by our go-to-market teams, who are navigating a difficult selling environment by remaining laser-focused on our North Star, acquiring new workloads."); *id* ¶ 89 ("So I would also say that our-go-to-market channels have to really focus on and are doing a really good job on qualifying these opportunities, being able to separate customers who are serious versus customers who may be just wanting to kick the tires."); *id.* ¶ 91 ("So when you hear us talk about our results, we talk about winning new customers. We talk about winning new workloads. And that's really kind of the key thing."); *id.* ("[I]n the medium to longer term, things are much more affected by are we winning new customers? Are we continuing to add new workloads within existing customers and sort of penetrate there?"); *id.* ¶ 94 ("[I]nitial workload grows—the first couple of years tend to be where there's the fastest growth, but the workload is still continu[ing] to grow for many, many years."); *id.* ("[T]he way that we really grow within the account is winning additional workloads."); *id.* ("But over time, the way you grow within the account is adding new workloads."); *id.* ¶ 95 ("In the long term, though, Atlas growth is driven by our ability to acquire new workloads. That's really the key thing because new workloads, in the long run, will drive most of the growth."); *id.* ("And the reality is the new workloads that you add over that subsequent workload wind up being responsible for the vast majority of the incremental growth."); *id.* ¶ 102 ("[P]ositions us better for the longer term by accelerating workload acquisition. We are pleased with the impact these changes have as in the business in the first half of the year. Specifically, new workload acquisition has accelerated, especially within existing customers. We believe that our efforts to reduce friction are resulting in more efficient growth, and we'll always look for ways to improve our go-to-market approach."); *id.* ¶ 106 (Mr. Gordan praised "[t]he sales teams [in] hav[ing] done a good job" in "navigat[ing]" the macroeconomic environment "very effectively," stating that he was "really pleased with the results there."); *id.* ¶ 107 ("So that reduction or that removal of that friction based on the change in comp plans has really helped us accelerate the acquisition of new workloads."); *id.* ("[W]e're really pleased by the velocity of the workloads we're acquiring . . . over the years we should see that impact really show up."); *id.* ¶ 109 ("[A]nything we can do to effectively and synthetically expand the impact of that sales force by freeing up time and giving them time is valuable."); *id.* ("[C]omp plans are complicated, reps are sensitive to them. You typically only change them once a year. You're not usually changing comp plans midyear."); *id.* ¶ 110 ("[W]hat we've particularly become more comfortable over time is our ability to call when we see that there's incremental workload potential in the account."); *id.* ("[T]hroughout this macro slowdown that began over a year ago, we've been very happy with our ability

of the statements classified as statements of opinion are not actionable, even as omissions, because the underlying fact allegedly omitted does not undermine the statement or otherwise render the statement misleading. A reasonable investor would not read these opinion statements as implying that the FY 2024 workloads were consuming at a particular rate. *New England Carpenters Guaranteed Annuity & Pension Funds*, 122 F.4th at 42 ("[T]he appropriate perspective for identifying whether a statement of opinion implies facts is that of the reasonable investor."). Nor would a reasonable investor read these opinions statements as implying that MongoDB's change to a consumption-based model resulted in any particular percentage of workloads that were consuming in line with historical consumption trends.

For example, statements[23] expressing "confidence" in and "happiness" or "pleasure" with MongoDB's ability to execute on its strategic growth plans, effectively transition to a consumption-

_____

to acquire new business."); *id.* ¶ 112 ("We are pleased by our success in winning new workloads."); *id.* ¶ 114 ("We are pleased with our ability to win new business."); *id.* ¶ 115 ("[O]ver the last couple of years one of the things we've been trying to do is reduce friction for the sales force. Some of that includes reducing the emphasis around upfront commitments. And so that helps accelerate landing new workloads and things like that."); *id.* ¶ 116 ("They're going to run more and more workloads on MongoDB."); *id.* ¶ 119 ("We spend a tremendous amount of time focusing on . . . 'Are we acquiring new workloads? Are we doing that if they are the same quality or better than what we've done in the past?'"); *id.* ¶ 128 ("I remain highly confident about our ability to execute on our long-term growth opportunity."); *id.* ¶ 129 ("[W]e see a stable environment."); *id.* ("We have seen more stable consumption that obviously gives us higher confidence in part, given the less variability that we've seen over the course of fiscal '24."); *id.* ¶ 130 ("I do think to the confidence point, I think that, that is correct. We do have more confidence. We have more data."); *id.* ("We saw more consistent results that does give us increased confidence.").

[23] The opinion statements expressing confidence in or optimism toward MongoDB's strategic plans that are nonactionable because they are not misleading by omission are: AC ¶ 89 ("So I would also say that our-go-to-market channels have to really focus on and are doing a really good job on qualifying these opportunities, being able to separate customers who are serious versus customers who may be just wanting to kick the tires."); *id.* ¶ 102 ("[P]ositions us better for the longer term by accelerating workload acquisition. We are pleased with the impact these changes have as in the business in the first half of the year. Specifically, new workload acquisition has accelerated, especially within existing customers. We believe that our efforts to reduce friction are resulting in more efficient growth, and we'll always look for ways to improve our go-to-market approach."); *id.* ¶ 106 (Mr. Gordan praised "[t]he sales teams [in] hav[ing] done a good job" in "navigat[ing]" the macroeconomic environment "very effectively," stating that he was "really pleased with the results there."); *id.* ¶ 107 ("So that reduction or that removal of that friction based on the change in comp plans has really helped us accelerate the acquisition of new workloads."); *id.* ("[W]e're really pleased by the velocity of the workloads we're acquiring . . . over the years we should see that impact really show up."); *id.* ¶ 110 ("[W]hat we've particularly become more comfortable over time is our ability to call when we see that there's incremental workload potential in the account."); *id.* ("[T]hroughout this macro slowdown that began over a year ago, we've been very happy with our ability to acquire new business."); *id.* ¶ 112 ("We are pleased by our success in winning new workloads."); *id.* ¶ 114 ("We are pleased with our ability to win new business."); *id.* ¶ 115 ("[O]ver the last couple of years one of the things we've been trying to do is reduce friction for the sales force. Some of that includes reducing the emphasis around upfront commitments. And so that helps accelerate landing new workloads and things like that."); *id.* ¶ 128 ("I remain highly confident about our ability to execute on our long-term growth opportunity.").

based pricing model, and commending employees for doing a "good job" identifying opportunities for implementation of the plans, are prototypical nonactionable statements of opinion. These statements express subjective judgments about MongoDB's ability to implement and operationalize its plans, are not objectively determinable, and are not rendered misleading by the purported omission of the FY 2024 workloads' consumption rates. As a result, the statements are inactionable opinions. *See e.g. In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 170 (concluding that statements that the company was "pretty confident" and "pretty positive" "about the prospect of renewing partnerships in 2019 . . . are best characterized as inactionable"); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 315 (S.D.N.Y. 2024) (concluding that statements that the team had "done a great job" of managing risks were inactionable puffery and opinion because they "express only a subjective state of mind" and because a reasonable investor would not understand them as conveying any "specific message"); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757–58 (S.D.N.Y. 2018) (concluding that statements that company was "confident about and prepared for what l[ie]s ahead" and in its "products and []overall commercialization strategy" were inactionable because the statement "d[id] no more than place a positive spin on [the] developments" and because the statements "reflect[ed] judgments . . . that [are] not objectively determinable").

In particular, Mr. Ittycheria's opinion that he "remain[ed] highly confident about [MongoDB's] ability to execute on our long-term growth opportunity," AC ¶ 128, is not an actionable opinion statement because Mr. Ittycheria was expressing his subjective view on strategy *execution* and not workload *consumption*. The alleged omitted fact as to the FY 2024 workloads' consumption rates does not undermine this statement—Mr. Ittycheria can still be confident about MongoDB's "ability to execute" on its growth opportunity even if some subset of its new workloads

were not consuming as expected.[24]  And read in context, the language "ability to execute" makes clear that Mr. Ittycheria's confidence was applicable to his belief that MongoDB could effectively implement the transition to a new consumption-based pricing model, he was not expressing that he was "confident" that some specific percentage of the workloads obtained under that model would consume at any particular rate.

And even if the Court assumed that Mr. Ittycheria "knew but fail[ed] to disclose some fact cutting the other way,"—that some subset of the FY 2024 workloads were not consuming as expected—that too, does not render his "confidence" misleading because "'[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts.'" *Abramson*, 965 F.3d at 175 (quoting *Omnicare*, 575 U.S. at 190).  A statement of opinion does not imply false information to a reasonable investor simply because there is 'some fact cutting the other way' that the speaker omitted." *Id.* (quoting *Omnicare*, 575 U.S. at 190).  In any event, MongoDB and its executives were "permitted 'to be confident about' its business model at this level of generality without risking liability." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 170 (alterations in original) (quoting *Rombach*, 355 F.3d at 174).  "[E]xpressions of . . . corporate optimism do not give rise to securities violations.  Up to a point, companies must be permitted to operate with a hopeful outlook." *Id.* (alterations in original) (quoting *Rombach*, 355 F.3d at 174).

The same is true for the opinion statements that merely express the speaker's subjective perspective as to how or why MongoDB's business is, and will continue to be, successful moving

---

[24] And Mr. Tanjga's statement "what we've particularly become more comfortable over time is our ability to call when we see that there's incremental workload potential in the account," is also a nonactionable opinion statement for substantially the same reasons.  AC ¶ 110.  Again, the alleged omitted fact does not undermine this statement because— even assuming that some subset of the FY 2024 workloads were not consuming as anticipated—this fact does not undermine Mr. Tanjga's confidence that MongoDB had gotten better at predicting workload potential overall.  The alleged omitted fact may suggest that sometimes MongoDB got its predictions wrong, but the securities laws do not require that MongoDB prophesize with Cassandra-like accuracy to avoid liability—"misguided optimism is not a cause of action" and "the Second Circuit has "rejected the legitimacy of 'alleging fraud by hindsight.'" *Shields*, 25 F.3d at 1129 (quoting *Denny*, 576 F.2d 470).  Mr. Tanjga is "not required to take a gloomy, fearful or defeatist view of the future" to avoid liability.  *Id.* at 1129–30.

forward[25]—such statements are not rendered misleading by the purported omission of information as to the alleged low consumption rate among the newly acquired FY 24 workloads. For example, read in context, Mr. Ittycheria's statement that MongoDB's "ongoing new business success is due to the mission criticality of our platform; and sharp execution by our go-to-market teams, who are navigating a difficult selling environment by remaining laser-focused on our North Star, acquiring new workloads" is not rendered misleading by the omission of information as to the FY 2024 newly acquired workload's consumption rate. AC ¶ 83. Rather, this statement expresses Mr. Ittycheria's perspective as to why MongoDB's business is, and will continue to be, successful. The inclusion of the alleged omitted information does not undermine this statement because the omitted information does not show that MongoDB's business success was not attributable to "the mission criticality of [the] platform," that MongoDB's platform was not "mission-critical," that its sales team lacked "sharp execution," or that it did not believe that emphasizing acquisition over commitment was not the company's new "North Star."[26] Nor would a reasonable investor take from a statement praising the sales team's "sharp execution," a message as to the consumption rates of the newly acquired workloads. And again, MongoDB and its executives are permitted to be generally optimistic about

---

[25] The nonactionable opinion statements merely expressing subjective perspectives as to how or why MongoDB's business is or will be successful are: AC ¶ 83 ("Our ongoing new business success is due to the mission criticality of our platform; and sharp execution by our go-to-market teams, who are navigating a difficult selling environment by remaining laser-focused on our North Star, acquiring new workloads."); *id.* ¶ 91 ("So when you hear us talk about our results, we talk about winning new customers. We talk about winning new workloads. And that's really kind of the key thing."); *id.* ("[I]n the medium to longer term, things are much more affected by are we winning new customers? Are we continuing to add new workloads within existing customers and sort of penetrate there?"); *id.* ¶ 94 ("[I]nitial workload grows—the first couple of years tend to be where there's the fastest growth, but the workload is still continu[ing] to grow for many, many years."); *id.* ("[T]he way that we really grow within the account is winning additional workloads."); *id.* ("But over time, the way you grow within the account is adding new workloads."); *id.* ¶ 95 ("In the long term, though, Atlas growth is driven by our ability to acquire new workloads. That's really the key thing because new workloads, in the long run, will drive most of the growth."); *id.* ("And the reality is the new workloads that you add over that subsequent workload wind up being responsible for the vast majority of the incremental growth."); *id.* ¶ 109 ("[A]nything we can do to effectively and synthetically expand the impact of that sales force by freeing up time and giving them time is valuable."); *id.* ¶ 114 ("We are pleased with our ability to win new business."); *id.* ¶ 116 ("They're going to run more and more workloads on MongoDB.").

[26] The terms "mission-critical," "laser-focused" and "sharp execution" indicate subjectivity because they lack any objective standard. No reasonable investor would rely on such terms because they are so amorphous. For this reason, some of the statements that the Court has classified as opinions are also puffery, as discussed herein.

41

the company's future without running afoul of the securities laws. *In re Synchrony Fin. Sec. Litig.*, 988

F.3d at 170 (alterations in original) (quoting *Rombach*, 355 F.3d at 174).

In sum, some,[27] but not all, of the challenged statements are opinion statements.  And some,

but not all,[28] of the statements of opinion are not rendered misleading by virtue of their omission of

the FY 2024 newly acquired workloads' consumption rates.[29]

Next, Lead Plaintiff also "challenge[s] dozens of statements describing various aspects of

MongoDB's business in generically positive terms."  Mem. at 11.  Some,[30] but not all, of the

---

[27] *See supra* note 15 (identifying challenged statements which are statements of opinion).

[28] Some of the opinion statements could plausibly be rendered misleading by omission of the information as to the FY 2024 workloads' consumption rates.  *See, e.g.*, AC ¶¶ 84 ("Our ability to win new workloads remained strong, and Atlas consumption trends were better than expected."), 122 (in responding to a question as to whether here was "anything to keep in mind" when comparing revenues between years implementing a commitment as compared to consumption model, "No, not really . . . we've learned a decent amount about change management and how to implement this and roll this out in fiscal year '24."), 129 ("I think the key thing is, once you adjust for those onetime items that we called out, we see a stable environment.").  The opinion statements that are plausibly misleading by omission and which are not rendered inactionable for an alternative reason are discussed later in the opinion.

[29] *See supra* note 22 (identifying statements of opinion which are not rendered misleading by any omission of information as to the FY 2024 new workloads' consumption rate).

[30] The following challenged statements are inactionable puffery:  AC ¶ 82 ("Continued Strong Customer Growth"); *id.* ("The continued strength in new business activity indicates the mission criticality of the MongoDB developer data platform."); *id.* ¶ 83 ("Our ongoing new business success is due to the mission criticality of our platform; and sharp execution by our go-to-market teams, who are navigating a difficult selling environment by remaining laser-focused on our North Star, acquiring new workloads."); *id.* ("Overall, we delivered a strong Q1.  We had a very healthy quarter of new business acquisition."); *id.* ¶ 84 ("Our ability to win new workloads remained strong."); *id.* ("Atlas consumption trends were better than expected."); *id.* ¶ 85 ("[W]e continue to see a healthy new business environment both in terms of acquiring new customers as well as acquiring new workloads within existing customers . . . Our new business performance and strong total customer net additions demonstrate the continued demand for our developer data platform."); *id.* ¶ 87 ([W]e also just don't focus on acquiring but also making sure they're onboarded properly; they're serviced properly so that those workloads grow well."); *id.* ("The only way we can really influence that is, over the long term, by acquiring more and more workloads either [] from existing customers or acquiring new customers.  And so we're really focused on what we can control, which is all about acquiring new customers and new workloads."); *id.* ("[T]hat's ultimately the things we can control and that's what we're really focused on."); *id.* ¶ 100 ("Continued Strong Customer Growth."); *id.* ("[C]ontinued strength in new workload acquisition."); *id.* ¶ 101 ("[W]e're innovating both on the product and go-to-market dimensions to accelerate workload acquisition."); *id.* ("[W]e had another solid quarter of customer growth."); *id.* ("We had a healthy quarter of new business acquisition led by continued strength in new workload acquisition in our existing customers."); *id.* ("[W]e had another strong quarter of new business performance, which really validates our value proposition."); *id.* ("[R]etention rates remained strong in Q2, reinforcing the mission criticality of our platform."); *id.* ¶ 103 ("[W]e continue to see a healthy new business environment especially in terms of acquiring new workloads within existing customers."); *id.* ¶ 106 ("[T]he new business environment has remained robust."); *id.* (MongoDB had "been able to successfully navigate the macroeconomic environment" in "winning new workloads."); *id.* ¶ 109 ("Amazingly, incentives drive behavior."); *id.* ¶ 110 (Mr. Tanjga described the "new business environment" as "robust" and that "throughout this macro slowdown that began over a year ago, we've been very happy with our ability to acquire new business."); *id.* ¶ 112 ("Continued Strong Customer Growth."); *id.* ("MongoDB continued to perform at a high level in the third quarter."); *id.* ¶ 113 (MongoDB "had a healthy quarter of new business acquisition led by continued strength in new workload acquisition."); *id.* ("[R]etention rates remained strong n Q3, reinforcing the mission criticality of our platform."); *id.* ¶ 114 ("In terms of our direct sales net additions, new sales activity remained

challenged statements describing various aspects of MongoDB's business in generically positive terms are nonactionable puffery—"they convey[] no meaningful, objective data that an investor would rely upon." *Ray v. StoneCo Ltd.*, No. 21-cv-9620, 2024 WL 4308130, at \*9 (S.D.N.Y. Sept. 25, 2024) (internal quotation omitted) (quoting *Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 569–70 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019)).

Read in context, the descriptive terms used in these statements, such as "mission-critical," "healthy," "strong," and "robust," are largely "neither quantifiable nor factual, but rather subject to interpretation, within reason"—and the statements are therefore, not actionable." *See, e.g., Saskatchewan Healthcare Emps.' Pension Fund v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 385 (S.D.N.Y. 2024) (internal quotations omitted) (quoting *In re Yunji Inc., Sec. Litig.*, No. 19CV6403LDHSMG, 2021 WL 1439715, at \*8 (E.D.N.Y. Mar. 31, 2021)); *Ray v. StoneCo Ltd.*, 2024 WL 4308130, at \*9 (concluding that characterizations of returns as "healthy" and "strong" were "inactionable puffery"); *Diabat*, 2024 WL 4252502 at \*104; *Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*, 704 F. Supp. 3d 429, 445 (S.D.N.Y. 2023) (concluding that the statement "demonstrating the mission-critical nature of our solutions" was puffery because it is merely a "general statement[] of optimism"); *In re Grab Holdings Ltd. Sec. Litig.*, No. 1:22-CV-02189, 2024 WL

---

healthy."); *id.* ¶ 116 ("[C]ustomers are increasingly viewing MongoDB as a mission-critical platform."); *id.* ¶ 118 ("We continue to see growth of existing customers and existing workloads grow healthfully."); *id.* ("New business environment continues to be strong for us in terms of getting new workloads, both from existing customers as well as logos."); *id.* ¶ 119 ("We spend a tremendous amount of time focusing on . . . 'Are we acquiring new workloads? Are we doing that if they are the same quality or better than what we've done in the past?'"); *id.* ¶ 124 ("Continued Strong Customer Growth with Over 47,800 Customers as of January 31, 2024."); *id.* ("We continue to see healthy new workload wins."); *id.* ¶ 125 ("[W]e continue to innovate on our go-to-market motion to drive workload acquisition."); *id.* ¶ 126 (MongoDB "had another quarter of healthy new business acquisition demonstrating [MongoDB's] product market fit and the mission criticality of [the] platform."); *id.* ("[R]etention rates" remained strong through Q4, which "reinforce[d] the quality of our product and the mission criticality of our platform."); *id.* ¶ 127 ("[W]e see stable growth—stable usage growth across our portfolio of workloads."); *id.* ("I see stable consumption growth going to next year."); *id.* ¶ 129 ("[W]e see a stable environment."); *id.* ("We have seen more stable consumption that obviously gives us higher confidence in part, given the less variability that we've seen over the course of fiscal '24."); *id.* ¶ 134 ("[W]hat that meant in fiscal '24 was the workloads that we acquired during the year in addition to those that we acquired in the year before . . . contributed to the stable growth that we saw in fiscal '24 relative to fiscal '23.").

1076277 (S.D.N.Y. Mar. 12, 2024) (concluding that statements describing "strong trends" in profitability inactionable puffery).

Some of the statements[31] in this bucket merely describe MongoDB's business and new-go-to-market strategy in vaguely positive terms and without any objective referent for the positive terms, such as the repeated references to MongoDB's platforms as "mission critical." *Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund*, 704 F. Supp. 3d at 445 (concluding that the statement "demonstrating the mission-critical nature of our solutions" was puffery because it is merely a "general statement[] of optimism"). The statements are inactionable puffery because they "are too general to cause a reasonable investor to rely upon them." *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 408 (concluding that characterizations of study methodology as "rigorous," "extensive," "thorough," "systematic," "unique in . . . completeness and transparency," "the best science," and "very advanced" "are precisely the type of puffery that [we] have consistently held to be inactionable"). "Vague positive statements regarding a corporate entity's risk management strategy, asset quality, and business practices are 'too general to cause a reasonable investor to rely upon them' and therefore are 'precisely the type of puffery that this and other circuits have consistently held to be inactionable.'" *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 170 (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) ("[M]ere generalizations regarding [the defendant's] business practices . . . are . . . puffery" (quoting *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996)))).

---

[31] *See supra* note 30. For example, "Our ongoing new business success is due to the mission criticality of our platform; and sharp execution by our go-to-market teams, who are navigating a difficult selling environment by remaining laser-focused on our North Star, acquiring new workloads." AC ¶ 83. Terms like "mission criticality," "sharp execution," and laser-focused" are classic puffery indicia because they are not verifiable and they "cannot be proven false." *MacNaughton*, 67 F.4th at 96 (internal quotations omitted) (discussing puffery under New York law in the context of New York General Business law §§ 349 and 350).

Statements[32] discussing "better than expected" trends, AC ¶ 84, the "continued demand," *id.* ¶ 85, for MongoDB's products and how "MongoDB continued to perform at a high level," *id.* ¶ 112, are also inactionable puffery because, at most, they "vaguely and enthusiastically describe [defendant's] performance and expectations of business success." *Xerox Corp.*, 300 F. Supp. at 569, *aff'd sub nom.* 771 F. App'x 51. These statements, too, are not the type of statements upon which a reasonable investor would rely.[33] *Meyer v. Organogenesis Holdings Inc.*, 727 F. Supp. 3d 368 (E.D.N.Y. 2024) (concluding that "Our better-than-expected growth in Q1" was inactionable puffery); *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 364 (S.D.N.Y. 2019), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020) (concluding that the statement "demand keeps growing" is inactionable puffery).

And statements generically describing how MongoDB is "innovating both on the product and go-to-market dimensions to accelerate workload acquisition," AC ¶ 101, is "focused on what [it] can control," *id.* ¶ 87, and is spending a "tremendous amount of time focusing on" workload acquisition, *id.* ¶ 119, are also inactionable puffery.[34] *Diabat*, 2024 WL 4252502 at *84 (statement as to company's "focus[] on the execution of [its] strategic plan" was inactionable puffery); *Xerox Corp.*, 300 F. Supp. 3d at 570 (statements as to "focus" on healthcare platform were puffery). Statements describing MongoDB's "focus on what it can control" and identifying that it is spending a "tremendous amount of time focusing on" workload acquisition are nothing more than "aspirational generalization[s]"; they are not the types of statements that a reasonable investor would rely upon. *In re Vale S.A. Sec. Litig.*, 2017 WL 1102666 at *22 (concluding that statements as to what the defendant was "focused on" and "aiming to do" are inactionable "aspirational generalizations"). In any event, "expressions of . . . corporate optimism do not give rise to securities violations[] [because]

---

[32] *See supra* note 30.
[33] In any event, Lead Plaintiffs do not contend that these statements are false.
[34] *See supra* note 30.

[u]p to a point, companies must be permitted to operate with a hopeful outlook." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 170 (quoting *Rombach*, 355 F.3d at 174).

By contrast, Mr. Ittycheria's statement that "it's all about us acquiring high-quality workloads.  If we can []acquire high-quality workloads, onboard them well and make sure they're serviced as well, good things will happen, *and that's happening*," AC ¶ 89 (emphasis added), is not puffery when read in context because it could have "misled investors about the nature of the new workloads [by] [] touting the quality of their growth characteristics," Opp'n at 11.  "[A] term like 'high quality' might be mere puffery or insufficiently specific to support liability in some contexts." *Arkansas Teacher Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014) (concluding that "high quality" was "clearly a material misrepresentation when applied to assets that are entirely worthless").  *But see, e.g.*, *Saskatchewan Healthcare Emps.' Pension Fund*, 718 F. Supp. 3d at 385 (concluding that statements describing "high quality" services were inactionable statements of opinion); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (concluding that "safe, high quality food" was puffery); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d at 534 (concluding that the statement "high-quality investment capabilities" was puffery); *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 580 (S.D.N.Y. 2012) (concluding that "high-quality career-based education" was "typical corporate puffery").

Here, however, the term "high-quality," read in context, is not puffery because "high-quality" has a plausible objective meaning for investors—workloads that "exhibit better growth and consumption characteristics."  Opp'n at 12.  This definition is supported by the context in which the term "high-quality workloads" appears—

> So I would also say that our go-to-market channels have to really focus on and are doing a really good job on qualifying these opportunities, being able to separate customers who are serious versus customers who may be just wanting to kick the tires. And again, as I mentioned earlier, it's all about us acquiring high-quality workloads.  If

we can [] acquire high-quality workloads, onboard them well and make sure they're serviced as well, good things will happen, and that's happening.[35]

AC ¶ 89. The text preceding the term "high-quality workloads" compares "serious" customers with customers "who may be just wanting to kick the tires"—customers who will continue to consume and those customers who will not do so. Read in conjunction with the immediately preceding text, the term "high-quality" is referring to the former category—"serious" customers—those customers who will consume.

Lead Plaintiffs' proffer that investors would understand references to "high-quality workloads" to have this objective meaning is further supported by Ms. Gill's use of the term "low-quality" and Mr. Ittycheria's use of the term "high-quality" in a different earnings call. Ms. Gill stated that "when you have a unit-based plan you always run into the risk of driving a lot of low-quality stuff . . . we had a lot of reps that were overachieving landing 'new logos' that has signed a contract but never even actually consumed." *Id.* ¶ 50. In context, Ms. Gill's reference to "low-quality stuff" is referring to the workloads that "never even actually consumed." *Id.* Because "low-quality stuff" means workloads that "never even consumed," Lead Plaintiffs have plausibly pleaded that "high-quality" means the opposite—workloads that are consuming. *Id.*

And Mr. Ittycheria's comments also support the conclusion that the phrase "high-quality workloads" has a "determinate and verifiable" meaning here such that it is not mere puffery. *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 418. Specifically, Mr. Ittycheria stated that MongoDB was working to "ensure that our salespeople and our teams focus on higher-quality workloads that have higher growth potential." *Id.* ¶¶ 75, 76 (Mr. Ittycheria: "What we have done is change the incentive systems a bit to emphasize more quality of workloads in the sales comp plans. So by definition,

---

[35] Mr. Ittycheria's statement includes generic and unquantifiable phrases like "well" and "good things will happen." Removed from context, such language is typically too general for a reasonable investor to rely upon. But importantly, Mr. Ittycheria also stated "and that's happening," which suggests that his commentary was verifiable because the "good things"—namely, MongoDB's acquisition of "high-quality" workloads"—were presently occurring.

they're very incentivized to really push for the higher-growth workloads."). That Mr. Ittycheria referred to "higher-quality workloads" as those workloads that have the characteristic of "higher growth potential" further supports the conclusion that in this context "high-quality" has an objective meaning to investors—workloads that will yield additional sales. As a result, Lead Plaintiffs have plausibly pleaded that a reasonable investor would understand the term "high-quality workloads" to mean workloads with better growth and consumption characteristics given the relevant context in which the phrase "high-quality workloads," appears, in conjunction with Ms. Gill's and Mr. Ittycheria's comments. Accordingly, this statement is not puffery.

And while some of the challenged statements use adjectives like "stable" and "steady," as well as language like "in line with" and "as expected"—language that is typically too generic to cause a reasonable investor to rely on it, *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 171 (affirming district court's dismissal of "stable asset quality" and "relatively stable" net charge off-rates as inactionable puffery)—reading this language in context, the Court cannot conclude that all of the statements that use such language are mere puffery.[36] *Cf. Diabat*, 2024 WL 4252502, at *102 (concluding that "more stable" was inactionable puffery). Rather, read in the context in which they appear, adjectives like "stable" and steady," as used in some of the challenged statements, are "determinate and verifiable," *In Re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th at 418, because they have an objective referent, namely—prior consumption rate data.[37] *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,

---

[36] The statements that use terms like "stable," "as expected," or "steady" that are not puffery are: AC ¶ 84 ("Atlas consumption trends were better than expected."); *id.* ¶ 127 ("Atlas consumption trends have been steady for several quarters now and we experienced less consumption variability in fiscal '24 compared to fiscal '23."); *id.* ¶ 129 ("[W]e expect Atlas consumption trends to be in line with the consumption growth we experienced in fiscal '24."); *id.* ¶ 130 ("Atlas looks consistent from a consumption standpoint. And that's in line with the stable trends we've seen over the course of fiscal '24.").

[37] By contrast, the statements that describe consumption as "stable" without reference to prior consumption rates are puffery because "stable" used in that context lacks any objective or verifiable definition and is overly general. *In re Synchrony Fin. Sec. Litig.,* 988 F.3d at 171. The statements which include adjectives or language like stable without any objective referent are: AC ¶ 127 ("[W]e see stable growth—stable usage growth across our portfolio of workloads."); *id.* ("I see stable consumption growth going to next year."); *id.* ("[W]e see stable growth—stable usage growth across our portfolio of workloads."); *id.* ¶ 129 ("[W]e see a stable environment."); *id.* ("We have seen more stable consumption that obviously gives us higher confidence in part, given the less variability that we've seen over the course of fiscal '24."); *id.*

48

432 F. Supp. 3d 131, 166 (D. Conn. 2019) (discussing statement that the defendant's "pricing has remained stable").

For instance, Mr. Ittycheria's statement "Atlas consumption trends have been steady for several quarters now and we experienced less consumption variability in fiscal '24 compared to fiscal '23," AC ¶ 127, is not puffery because his use of the adjective "steady," is measurable and verifiable by reference to Atlas consumption rates from prior quarters. *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 227–28 (S.D.N.Y. 2023) (concluding that the statement "customer retention rate will remain stable at a relatively high level" was actionable where plaintiff had plausibly pleaded that there was a "serious decline" in customer retention). Whether Atlas consumption in fact remained consistent with consumption rates from prior quarters is verifiable simply by comparing current consumption rates with historical data. And here, as in *Wang*, adjectives like "steady" or "stable" would have "left investors with an impression of . . . stable results in" workload consumption rates, a "critical component" of MongoDB's business model. *Id.* at 228. As a result, these statements[38] are not puffery and are actionable.

In sum, some,[39] but not all, of the challenged statements are inactionable either because they are statements of opinion that are not rendered misleading by the omission of information as to the FY 2024 workloads' consumption rates, because they are puffery, or both.

### ii. Some, But Not All, of the Challenged Statements Did Not Provoke Additional Disclosure Obligations

At the outset, the Court notes that Lead Plaintiffs are not alleging that Defendants made affirmative misrepresentations.[40] Nor do Lead Plaintiffs allege that MongoDB was under an

---

¶ 134 ("[W]hat that meant in fiscal '24 was the workloads that we acquired during the year in addition to those that we acquired in the year before . . . contributed to the stable growth that we saw in fiscal '24 relative to fiscal '23.").

[38] *See supra* note 36.

[39] *See supra* notes 14, 22, & 30.

[40] Although Lead Plaintiffs, at various points suggest that this case arises, in part, "out of Defendants' misrepresentations *and* omissions," AC ¶ 2 (emphasis added), Lead Plaintiffs do not contend that the challenged statements are affirmative misrepresentations. Nor do they, in arguing against dismissal, contend that they have adequately pleaded falsity. Rather,

affirmative legal obligation to disclose that its newly acquired workloads were not growing or consuming at expected rates.  Rather, Lead Plaintiffs contend that Defendants' statements are actionable "because they omitted material information about the then-known state of their new workload acquisitions that, in context, was necessary to render their statements not misleading."[41] Opp'n at 3.  Lead Plaintiffs point to several categories of statements—among them new workload quality and consumption trends; go-to-market impact; risk; workload and customer acquisitions; and retention rates—that they assert triggered an obligation for MongoDB to disclose that its newly acquired workloads were not growing or consuming in line with historical rates.  But this is not a reasonable reading of many of the challenged statements in context and MongoDB was not required to make additional disclosures to correct a misimpression that never actually arose.

Here, some,[42] but not all, of the challenged statements did not impose an obligation on Defendants to speak to the FY 2024 newly acquired workloads' consumption rates because a

---

as their opposition to Defendants' motion to dismiss makes clear, Lead Plaintiffs' real contention here is that "Defendants knew, but did not disclose that their revamped GTM strategy and sales incentive plan resulted in a glut of slow-growing, 'low-quality' workloads."  Opp'n at 1.  Because Lead Plaintiffs do not contend that the challenged statements are affirmative misstatements, and because Lead Plaintiffs' argument in opposition to dismissal is explicitly premised on the theory that "Defendants . . . statements are actionable because they omitted material information about the then-known state of their knew workload acquisitions that, in context, was necessary to render their statements not misleading," *id.* at 3, the Court treats Lead Plaintiffs' claims as based only on a theory of omission-based liability.

[41] Because Lead Plaintiffs do not allege that Defendants made any affirmative misrepresentations in this case, the Court need not address Defendants' argument that Lead Plaintiffs have failed to plead falsity which is not dispositive of Lead Plaintiffs' omission-based claims.  Nonetheless, the Court addresses many of the same arguments Defendants raise with respect to falsity when analyzing whether the challenged statements are nonactionable puffery or statements of opinion.

[42] The challenged statements that do not impose an additional obligation on Defendant to speak to the FY 2024 workloads' consumption rates are:  AC ¶ 82 ("[H]ighlighted by 40% Atlas revenue growth and the most net new customer additions in over two years."); *id.* ("In fact, this quarter, we acquired a record number of new workloads from our existing customers."); *id.* ¶ 89 ([W]e had a record number of new workloads added this quarter from existing customers."); *id.* ¶ 92 ("[C]ontinued to add significant numbers of new customers" and had its "strongest net additions in customer count this past quarter."); *id.* ¶ 94 ("And so our whole company is oriented around winning more workloads.  This is not just a go-to-market orientation, although importantly, it is a go-to-market orientation, and that's a change or that's a shift from winning a big multiyear contract."); *id.* ¶ 95 ("[W]e have to win that first initial workload.  That workload will grow based on a number of application-specific factors, but also based on the macroeconomic environment."); *id.* ¶ 102 ("We are highly focused on reducing friction in the sales process so we can acquire more workloads quickly and cost effectively given the large size of our market opportunity."); *id.* ¶ 109 ("[I]t's been part of a multiyear effort to reduce friction in the process, which includes reducing the emphasis or the importance of commitments."); *id.* ¶ 122 (in responding to a question as to whether here was "anything to keep in mind" when comparing revenues between years implementing a commitment as compared to consumption model, "No, not really . . . we've learned a decent amount about change management and how to implement this and roll this out in fiscal year '24."); *id.* ¶ 125 ("[W]e will remain singularly focused on new workload acquisition as a key long-term driver of our

reasonable investor would not have drawn any inferences about consumption rates from the statements. *Buhrke Fam. Revocable Tr.*, 726 F. Supp. 3d at 341 ("Here, a reasonable investor would not interpret statements about a bank's improvement in brand value to imply anything regarding the existence . . . of unauthorized account openings."). As a result, "there is no viable claim based on the alleged omission" of the FY 2024 newly acquired workloads' consumption rate based on the statements.[43] *In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d at 188. The Court analyzes whether each of the challenged statements triggered an additional disclosure requirement topic-by-topic[44] using exemplar statements. As will be illustrated below, some,[45] but not all, of the challenged statements did not obligate the disclosure of the type that Lead Plaintiffs demand.

First, statements touting the volume of MongoDB's new workload acquisition,[46] including the "record number" of new workload acquisitions, did not obligate Defendants to make additional disclosures with respect to the FY 2024 newly acquired workloads' consumption rates. A reasonable investor would not understand those statements to imply anything about consumption rates because the subject matter of the statements—the volume of workload acquisition—is not related "closely enough to the allegedly omitted information" about consumption rates "such that a reasonable investor might have drawn inferences" about consumption rates based on the statements. *Buhrke Fam. Revocable Tr.*, 726 F. Supp. 3d at 340. "Each of th[e]se statements were nothing more than accurate descriptions of the growth" of MongoDB's volume of workload acquisition, and not

---

business. We will continue fine-tuning incentives to ensure that our entire go-to-market organization is focused on identifying and sourcing new workload opportunities.").

[43] *See supra* note 42.

[44] Because the Court has concluded that many of the challenged statements are inactionable puffery or opinion statements, in this section, the Court addresses these statements by the topic discussed, rather than adopting the category convention as used by Lead Plaintiffs and as used in this opinion *supra*.

[45] *See supra* note 42.

[46] The following statements touting the volume of new workload acquisition that did not impose an additional obligation on Defendant to speak to consumption rates are: AC ¶ 82 ("[H]ighlighted by 40% Atlas revenue growth and the most net new customer additions in over two years."); *id.* ("In fact, this quarter, we acquired a record number of new workloads from our existing customers."); *id.* ¶ 89 ([W]e had a record number of new workloads added this quarter from existing customers."); *id.* ¶ 92 ("[C]ontinued to add significant numbers of new customers" and had its "strongest net additions in customer count this past quarter.").

promises as to any particular rate of consumption resulting from that growth in acquisition volume.[47] *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d at 404 (concluding that accurate statements describing the growth of diabetes products sales were not actionable as omissions because "the omission of the alleged illegal marketing is not 'sufficiently connected to defendants' existing disclosures'").

MongoDB was not obligated to make any additional disclosures with respect to statements touting the volume of workload acquisitions because a discussion of the high number of newly acquired workloads does not give rise to any inferences about how those workloads would ultimately consume. Simply put—the volume of acquisition does not imply information about the quality of the acquired workloads. Rather, the two topics lack the kind of "connection" between them sufficient to impose an obligation on MongoDB to make additional disclosures. *In re Eastman Kodak Co. Sec. Litig.*, 632 F. Supp. 3d at 188; *Buhrke Fam. Revocable Tr.*, 726 F. Supp. 3d at 349 ("As to the statements that USB was subject to pending investigations and was cooperating with such investigations, the statements again lack a sufficiently close nexus to the fact of the unauthorized account openings, as no reasonable investor would take a statement that USB was subject to investigations and cooperating with such investigations to imply anything about whether USB ever experienced unauthorized account openings.").

For example, Mr. Ittycheria's statement "we had a record number of new workloads added this quarter from existing customers," AC ¶ 89, did not impose an obligation on Defendants to speak to workload consumption rates among the FY 2024 workloads because a reasonable investor would not have drawn inferences about the FY 2024 workload consumption rates based on the

---

[47] Lead Plaintiffs do not contend that statements describing the volume of new workload acquisition or characterizing the volume of acquisition as "record breaking" among other descriptive language are false. And generally, "a violation of federal securities laws cannot be premised upon a company's disclosure of accurate historical data." *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d at 404 (noting that "accurate statements of past earnings and growth" are not actionable) (internal citations and quotations omitted).

statement. *Buhrke Fam. Revocable Tr.*, 726 F. Supp. 3d at 349; *see also* AC ¶ 82 ("In fact, this quarter, we acquired a record number of new workloads from our existing customers."). Lead Plaintiffs do not contend that Mr. Ittycheria's statement is false—they do not assert that MongoDB did not actually acquire "a record number of new workloads" that quarter. *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d at 404 ("[I]t cannot be the case that merely reporting [] growth in []colorful words, without attributing the sales growth to a particular factor that is implicated in the alleged fraud, is actionable.").

And Mr. Ittycheria's statement does not "relate closely enough to the allegedly omitted information" because the statement merely describes the volume of new workloads acquired without implying the particular rate at which the acquired workloads will eventually consume.[48] *Buhrke Fam. Revocable Tr.*, 726 F. Supp. 3d at 340. This statement does not imply information about consumption rates or "touch on the subject of workload (or consumption) *growth* at all." Mem. at 22 (emphasis in original). Because statements about the volume of workloads acquired did not "suggest[] that newly acquired workloads would continue to grow at expected or historical rates . . . or that all salespeople were onboarding new logos with a high propensity to consume," Mem. at 22, a reasonable investor would not draw inferences about consumption rates from the statements. Accordingly, MongoDB was not obligated to speak to the FY 2024 workloads' consumption when speaking on the topic of the volume of workload acquisition. *Diehl,* 339 F. Supp. 3d at 166 (concluding that the plaintiff "failed to allege, plausibly a nexus between the[] [challenged] statements and the [alleged] omission.").

---

[48] Moving from the intangible world of databases to the tangible world of dishware to illustrate why a reasonable investor would not draw inferences as to workload consumption based on statements only addressing the volume of workload acquisition—a person may collect vintage dishware and may have a lucky day where she "acquires the largest number of dishes to date!" Some of the newly acquired dishware may be high-quality Pyrex, and some may be chipped or dented. But the collector's statement that she acquired the largest number of vintage dishes to date does not imply how many (if any) of the dishes are high-quality nor does it imply how many (if any) of the dishes are in rough shape.

And Defendants were not obligated to disclose data on consumption rates just because some of the statements about the volume of workload acquisitions[49] reference other underlying data.  For example, Mr. Ittycheria's statement that MongoDB "began fiscal 2024 with strong first quarter results, highlighted by 40% Atlas revenue growth and the most net new customer additions in over two years," references underlying data with respect to Atlas revenue trends and customer additions. AC ¶ 82.  But Mr. Ittycheria's reference to a subset of data in MongoDB's possession does not trigger a duty to disclose all consumption rate data for the newly acquired FY 2024 workloads because disclosing some information does "not trigger a generalized duty requiring defendants to disclose the entire corpus of their knowledge." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366; *see also In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 529 (S.D.N.Y. 2020), *aff'd sub nom. Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, No. 21-2698-CV, 2022 WL 17587853 (2d Cir. Dec. 13, 2022) ("Nowhere . . . is there any legal authority or argument supporting Plaintiffs' claim that [the defendant] was required to disclose real-time churn or low engagement rates.").

Next, statements generally describing MongoDB's shift in its go-to-market orientation and focus on "reducing friction" also imposed no obligation on Defendants to disclose the FY 2024 consumption rates because no "reasonable investor [would] [] have drawn inferences about" the FY 2024 workloads' consumption rates based on statements describing strategic shifts in MongoDB's operations.[50] *Buhrke Fam. Revocable Tr.*, 726 F. Supp. 3d at 340 ("Here, a reasonable investor would

---

[49] *See supra* note 42.

[50] The statements describing MongoDB's focus on its new go-to-market strategy that did not impose an additional obligation on Defendant to speak to consumption rates are:  AC ¶ 94 ("And so our whole company is oriented around winning more workloads.  This is not just a go-to-market orientation, although importantly, it is a go-to-market orientation, and that's a change or that's a shift from winning a big multiyear contract."); *id.* ¶ 95 ("[W]e have to win that first initial workload.  That workload will grow based on a number of application-specific factors, but also based on the macroeconomic environment."); *id.* ¶ 102 ("We are highly focused on reducing friction in the sales process so we can acquire more workloads quickly and cost effectively given the large size of our market opportunity."); *id.* ¶ 109 ("[I]t's been part of a multiyear effort to reduce friction in the process, which includes reducing the emphasis or the importance of commitments."); *id.* ¶ 122 (in responding to a question as to whether here was "anything to keep in mind" when comparing revenues between years implementing a commitment as compared to consumption model, "No, not really . . . we've learned a decent amount about change management and how to implement this and roll this out in fiscal year '24."); *id.* ¶ 125 ("[W]e will remain singularly focused on new workload acquisition as a key long-term driver of our

not interpret statements about a bank's improvement in brand value to imply anything regarding the existence . . . of unauthorized account openings."). With respect to the statements in this bucket,[51] Defendants did not have any duty to disclose additional information as to consumption trends for newly acquired workloads when speaking to MongoDB's decision to operationalize its new go-to-market strategy because such statements do not imply a position regarding consumption trends for the new workloads acquired pursuant to that model.

For example, Mr. Ittycheria's statement that MongoDB "will remain singularly focused on new workload acquisition as a key long-term driver of our business [and] will continue fine-tuning incentives to ensure that our entire go-to-market organization is focused on identifying and sourcing new workload opportunities," did not obligate Defendants to disclose the FY 2024 newly acquired workloads' consumption rate. AC ¶ 125, *see also id.* ¶ 94 ("And so our whole company is oriented around winning more workloads. This is not just a go-to-market orientation, although importantly, it is a go-to-market orientation, and that's a change or that's a shift from winning a big multiyear contract."). Mr. Ittycheria's statement is a description of MongoDB's strategy; it does not promise any particular consumption level for workloads acquired pursuant to the new go-to-market strategy. And Lead Plaintiffs do not contend that this statement is false—they do not argue that MongoDB was not in fact "singularly focused on new workload acquisition." Nor do they allege that MongoDB would not continue to modify its incentive structure to focus on acquisition.[52] And again, MongoDB's focus on workload acquisition and change in go-to-market orientation does not imply a specific outlook regarding consumption levels as a result of its shift.

---

business. We will continue fine-tuning incentives to ensure that our entire go-to-market organization is focused on identifying and sourcing new workload opportunities.").

[51] *See supra* note 50.

[52] Rather, Lead Plaintiffs acknowledge that MongoDB tweaked its incentive structure at least twice.

As one more example:  some portions of Mr. Tanjga's response to a question asked during the January 16, 2024 Needham Growth Conference required him to speak to the FY 2024 workloads' consumption rates, while other portions of his response did not trigger an obligation to speak.  AC ¶ 122.  During the conference, the following exchange occurred—

> Question: [L]ast year was a big change, right, for the sales organization.  So are there any learnings or anything we should keep in mind, again, when thinking about comparisons, *whether on a revenue consumption basis and then new workloads or sales payout that occurred last year,* which may not be recurring this year?

> Mr. Tanjga:  No, not really.  I would say that we've—*because it wasn't our first change, we've learned a decent amount about change management and how to implement this and roll this out in fiscal year '24.*  And that's frankly the reason why you do it over multiple years.  You do it to build conviction that you're doing the right thing, *but you're also doing it to like demonstrate to the sales force, like why you're doing it, and there's a rationale for this.*  And so— and it wasn't actually terribly disruptive, given the size of the change that it was not in terms of sales attrition or anything like that.  So it was a big change.  You see it flow through the financials.  We also see it on the volume of new workloads, which is where we started the conversation and how good we feel about it.  *But as you think about like what does that mean in terms of compares or mechanics of the financial model for next year, nothing particular to call out.*[53]

*Id.* (emphasis added).  Lead Plaintiffs assert that Mr. Tanjga's response "denied any negative impact from the Company's go-to-market sales compensation plan."  *Id.*  That is not a fair reading of the entirety of Mr. Tanjga's response read in context.  *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 171 ("[Plaintiffs] may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud.").  Rather, reading Mr. Tanjga's response in full—*some* of the response did not obligate him to speak to the topic of FY 2024 workload consumption rates.  And *some* of the response did obligate him to speak to the FY 2024

---

[53] This statement was made on January 16, 2024.  "MongoDB's fiscal year [] begins on February 1 of the prior calendar year and ends on January 31 of the current calendar year."  AC ¶ 4 n.1.  As a result, Mr. Tanjga's January 16, 2024 response was made at the end of FY 2024.  A reasonable investor would therefore understand the root of the question asking for a comparison of "last year" to "this year" as references to FY 2023 and FY 2024 respectively.  Thus, Mr. Tanjga's response to the question's request for a comparison of those two years, succinctly referred to by him as "in terms of compares," would be reasonably understood to refer to a comparison of those two periods.  And a reasonable investor would understand Mr. Tanjga's reference to the "financial model for *next year*" as referring to the upcoming FY 2025.

workloads' consumption rates because a reasonable investor would draw inferences about the FY 2024 workloads' consumption rate based on those portions of his response that implied there was no change in the consumption rate among the FY 2024 workloads as compared to previous years.[54]

Specifically, with respect to the first portion of his answer, read in context, Mr. Tanjga's statement would not be construed as a denial of a change in consumption rates or construed as speaking to the subject of consumption rates at all.  Rather, Mr. Tanjga was discussing how, because MongoDB had previously implemented other large-scale changes, it had "learned a decent amount about change management."  AC ¶ 122.  Because MongoDB's transition to a consumption-based model was not its "first change," it was Mr. Tanjga's view that implementation was not "terribly disruptive," particularly given MongoDB's focus on ensuring that its sales teams understood the "rationale" underlying the transition.  Read in context, the first portion of Mr. Tanjga's response addresses MongoDB's purported familiarity with, and resulting comfort in, implementing large-scale, company-wide changes.  This portion of Mr. Tanjga's response, which focuses on change implementation, does not imply an expectation regarding workload consumption rates.  A company can speak to the fact that it is well-equipped to implement or operationalize a large-scale change without giving rise to an implication as to the ultimate output of that change.  Accordingly, Mr. Tanjga was not obligated to speak on to the subject of the FY 2024 workloads' consumption rates with respect to this portion of his response.

By contrast, the latter half of Mr. Tanjga's response, and his conclusion that there was "nothing in particular to call out" with respect to how FY 2023 compares to FY 2024 on a "revenue consumption basis . . . new workloads, or sales payout" was not about strategy implementation.

---

[54] Defendants correctly contend that generally "statements about historical workload growth patterns, inputs that contributed to workload growth, and customer's historical tendency to add workloads . . . do not imply that the consumption of the FY 2024 workloads had never varied and would never dip."  Reply at 10.  Here by contrast, Mr. Tanjga's response invoked a direct comparison to specifically indicate that there were no differences to call out between historical workload growth patterns and new workload growth patterns.

Rather, the latter half of Mr. Tanjga's response implied that the FY 2024 workloads' consumption rates were in line with FY 2023 consumption rates.[55] Mr. Tanjga had the option to, in response to the question, say nothing or indicate that he would not comment on the subject. *Basic Inc.*, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). But Mr. Tanjga did not choose to remain silent. Instead, Mr. Tanjga represented that "there was nothing particular to call out" with respect to MongoDB's "revenue consumption basis . . . new workloads, or sales payout" in FY 2024 compared to the previous fiscal year. AC ¶ 122. A reasonable investor could plausibly interpret this portion of Mr. Tanjga's response as implying that the FY 2024 workloads were consuming at the same rates as they had in the prior fiscal year—that nothing had changed with respect to consumption rates. *Buhrke Fam. Revocable Tr.*, 726 F. Supp. 3d at 350 (concluding that statement "that generally concerned the existence of government investigations . . . bears a sufficiently close nexus to the omitted fact of the [specific] investigation" that was alleged to have been ongoing at the time the statement was made). As a result, this portion of Mr. Tanjga's response triggered an obligation for him to speak to the FY 2024 workloads' consumption rates.

Finally, Lead Plaintiffs have adequately pleaded that some of the challenged statements[56] triggered an obligation to disclose the FY 2024 workloads' consumption rates because a reasonable

---

[55] The Court notes that it is possible that MongoDB's transition to a consumption-based model resulted in some percentage of new workloads that were not consuming as anticipated, but that any reduction in overall revenue resulting from any purported lower consumption among a subset of the new workloads was offset by a commensurate increase in revenue resulting from the overall volume of new workload acquisition. This was, of course, presumably MongoDB's reason for transitioning to a consumption-based model in the first instance. Indeed, Mr. Tangja's comments ultimately proved prescient and by the end of the fiscal year, MongoDB's "actual results not only beat its revised guidance, they beat [its] original prediction." Mem. at 1; Dkt. No. 75-23 at 2.

[56] The challenged statements that triggered an obligation to speak are: AC ¶ 84 ("Atlas consumption trends were better than expected."); *id.* ¶ 89 ("[I]t's all about us acquiring high-quality workloads. If we can []acquire high-quality workloads, onboard them well and make sure they're serviced as well, good things will happen, and that's happening."); *id.* ¶ 122 ("[A]nd it wasn't actually terribly disruptive, given the size of the change that it was not in terms of sales attrition or anything like that."); *id.* ("We also see it in the volume of new workloads, which is where we started the conversation and how good we feel about that. But as you think about like what does that mean in terms of compares or mechanics of the financial model for next year, nothing particular to call out."); *id.* ¶ 127 ("Atlas consumption trends have been steady for several quarters now and we experienced less consumption variability in fiscal '24 compared to

investor would have drawn inferences from the statements that the FY 2024 workloads were consuming at the same rates as workloads acquired pursuant to MongoDB's prior commitment-based sales model.  For example, statements describing consumption trends as "stable," "steady," or "as expected" imply that the FY 2024 workloads were consuming at the same rate as workloads acquired previously or that consumption rates among the FY 2024 workloads had not dipped when compared to consumption rates from prior years.  AC ¶¶ 84 ("Atlas consumption trends were better than expected."); 127 ("Atlas consumption trends have been steady for several quarters now and we experienced less consumption variability in fiscal '24 compared to fiscal '23."), 130 ("Atlas looks consistent from a consumption standpoint.  And that's in line with the stable trends we've seen over the course of fiscal '24."); 129 ("[W]e expect Atlas consumption trends to be in line with the consumption growth we experienced in fiscal '24.").  As a result, Lead Plaintiffs have plausibly pleaded that these statements triggered an obligation to speak to the subject of the FY 2024 workload consumption rates.  *Wang*, 661 F. Supp. 3d at 228 (S.D.N.Y. 2023) ("It is reasonable to infer that [the] statement[] ['our . . . customer retention rate will remain stable'] would have left investors with an impression of strong and stable results in [defendant's] customer retention, a critical component of [defendant's] business model, when in fact [defendant's] dollar-based net customer retention rate had plummeted.").

In sum, a reasonable investor would not read some[57] of the challenged statements to imply anything about the FY 2024 workload consumption rates because MongoDB was speaking on other topics like the volume of workload acquisition and overall go-to-market strategy that did not imply information about consumption rates.  These statements are "distinct and afield from the fact

---

fiscal '23."); *id.* ¶ 129 ("[W]e expect Atlas consumption trends to be in line with the consumption growth we experienced in fiscal '24."); *id.* ¶ 130 ("Atlas looks consistent from a consumption standpoint.  And that's in line with the stable trends we've seen over the course of fiscal '24."); *id.* ¶ 134 ("And what you can see if as you add in those first workloads, they sort of are accretive to growth, right?  They're adding to the growth rate.").
[57] *See supra* note 42.

omitted"—the FY 2024 newly acquired workload consumption rates. *See In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d at 171–72. Accordingly, some,[58] but not all,[59] of the challenged statements did not trigger an obligation for MongoDB to speak to FY 2024 workload consumption rates.

### iii.    Forward-Looking Statements Protected by Cautionary Language

Finally, some[60] of the statements challenged by Lead Plaintiffs are not actionable because they are forward-looking statements accompanied by meaningful cautionary language.[61] A threshold issue in determining the applicability of either the PSLRA's safe harbor provision or the bespeaks-caution doctrine is a determination of whether the challenged statements are forward-looking in nature. "As a general rule, statements whose truth cannot be ascertained until some time after the time they are made are 'forward-looking statements.'" *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 493 (S.D.N.Y. 2011) (internal quotation marks and citation omitted) (collecting cases). In discussing the bespeaks-caution doctrine in particular, the Second Circuit has contrasted "forward-looking" statements with statements of "present or historical facts," in other words, statements regarding "facts [that] exist and are known." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96–97 (2d Cir. 2004). "A forward-looking statement (accompanied by

---

[58] *See supra* note 42.

[59] *See supra* note 56.

[60] The challenged statements that are nonactionable forward-looking statements are: AC ¶ 82 ("There is a risk that customers will consume our MongoDB Atlas offering more slowly than we expect, and our actual results may differ from our forecasts and our future revenue may be less predictable going forward due to, among other things, fluctuations in the rate of customer renewals and expansions and seasonality of, or fluctuations in, usage of MongoDB Atlas."); *id.* ¶ 129 ("[W]e expect Atlas consumption trends to be in line with the consumption growth we experienced in fiscal '24."); *id.* ¶ 130 ("Atlas looks consistent from a consumption standpoint. And that's in line with the stable trends we've seen over the course of fiscal '24.").

[61] Defendants contend that these statements are not actionable because they are "forward looking *and* protected by the PSRLA's safe harbor." Mem. at 18 (emphasis added); *see* 15 U.S.C.A. § 78u-5. The Court notes that neither parties' briefing addresses the safe harbor's applicability to statements alleged to have omitted existing material information, rather than statements exclusively about the future. *See, e.g.*, *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 340 (S.D.N.Y. 2001) (explaining that the PSLRA safe harbor applies "to forward-looking statements only, and not to material omissions or misstatements of historical fact"); *City of Providence v. Aeropostale, Inc.*, No. 11 CIV. 7132 CM THK, 2013 WL 1197755, at *12 (S.D.N.Y. Mar. 25, 2013) ("[T]he safe harbor does not apply to material omissions.") (collecting cases). Because Defendants argue that these statements are not actionable both because they are forward-looking and because Lead Plaintiffs have not contested the applicability of the PSLRA's safe harbor to omission-based claims, Court declines to address this issue, and analyzes the statements pursuant only to the bespeaks-caution doctrine.

cautionary language) expresses the issuer's inherently contingent prediction of risk or future cash flow; a non-forward-looking statement provides an ascertainable or verifiable basis for the investor to make his own prediction." *Iowa Pub. Emp. Ret. Sys.*, 620 F.3d at 143.

Here, some of the challenged statements are inherently forward-looking.[62]  Some of the statements in this bucket contain explicitly forward-looking, future-tense, or predicative language including "we expect" and "going into next year."  AC ¶¶ 82 ("There is a risk that customers *will consume* our MongoDB Atlas offering more slowly than *we expect*, and our actual results may differ from our *forecasts* and our *future* revenue may be less predictable *going forward* due to, among other things, fluctuations in the rate of customer renewals and expansions and seasonality of, or fluctuations in, usage of MongoDB Atlas." (emphasis added)); 129 ("[W]e *expect* Atlas consumption trends to be in line with the consumption growth we experienced in fiscal '24." (emphasis added)).[63] And some of the statements in this bucket are forward-looking when read in the context in which they appear because the truth of the statement cannot be presently ascertained.  For instance, as Lead Plaintiffs acknowledge, when Mr. Gordon stated that "Atlas looks consistent from a consumption growth standpoint," he was "comment[ing] on MongoDB's prospective performance for FY 2025" and not commenting on current consumption growth.  *Id.* ¶ 130.  Mr. Gordon's commentary on prospective Atlas consumption growth is not presently ascertainable.  Accordingly, these statements are forward-looking.[64]

In analyzing Defendants' disclosures "in [their] entirety," the Court concludes that a "reasonable investor would not have been misled" as to the risks associated with MongoDB's

---

[62] *See supra* note 60.

[63] The Court notes that "when the present-tense portion of mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection." *In re Supercom Inc. Sec. Litig.,* No. 15 Civ. 9650, 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018) (citation omitted).

[64] *See supra* note 60.

transition to a consumption-based model and purported lower workload consumption given the on-point risk disclosures. *Rombach*, 355 F.3d at 173–74.

Investors were specifically warned of the risks associated with decreased consumption of MongoDB's platforms generally and Atlas specifically as disclosed by MongoDB throughout the Class Period. And investors were warned of a variety of factors specific to MongoDB, its databases, and its business operations generally that could contribute to reduced consumption rates, that MongoDB's customers had historically not increased consumption for various reasons, and that customers may fail to increase consumption of MongoDB's platforms in the future. "These are precisely the risks that Lead Plaintiffs claim transpired: customers failed to 'broaden their usage' of MongoDB's offerings, and new customers purportedly did not sufficiently consume." Mem. at 23. Lead Plaintiffs argue that the forward-looking statements are nevertheless actionable because MongoDB's disclosures were mere boilerplate and because the risk had already transpired—by the time such statements were made the risk that MongoDB's change to a consumption-model could result in the acquisition of new workloads that were slow-growing and not consuming as expected had already materialized. Opp'n at 19. The Court addresses each argument in turn.

First, MongoDB's risk disclosures were not mere boilerplate. Lead Plaintiffs contend that that Defendants "formulaic risk disclosures," "cannot possible constitute meaningful cautionary statements," because the disclosures "were wholly insufficient to disclose the magnitude of the risk associated with the accumulation of non-consuming or slow-growing workloads." Opp'n at 20. That is not a fair characterization of the breadth or specificity of MongoDB's disclosures. The Second Circuit has articulated that to be considered meaningful, "cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected . . . such as, for example, information about the issuer's business." *Slayton*, 604 F.3d at 771 (quoting Conference Report at 43, 1995 U.S.C.C.A.N. at 742) (concluding that the cautionary

language at issue "verges on the mere boilerplate, essentially warning that 'if our portfolio deteriorates, then there will be losses in our portfolio'"). "'The requirement for "meaningful" cautions calls for "substantive" company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.'" *Id.* at 772 (quoting *Southland Secs. Corp.*, 365 F.3d at 372; then citing *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 246–47 (5th Cir. 2009)).

But cautionary language need not "identify all factors" to be considered meaningful. *Id.* at 771 (citing 44, 1995 U.S.C.C.A.N. at 743); *Rombach*, 355 F. 3d at 176 ("While some of these cautionary statements were formulaic, . . . as a whole they provided a sobering picture of [the company's] financial condition and future plans."). "[T]he anti-fraud laws do not require cautions to be articulated with maximum specificity." *Sec. & Exch. Comm'n v. SolarWinds Corp.*, 741 F. Supp. 3d 37, 92 (S.D.N.Y. 2024). "This is particularly so when there is ample disclosure of the broader risk." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

Here, MongoDB's cautionary language was meaningful because the risk disclosures conveyed substantive, company-specific information about factors that could cause consumption rates generally and Atlas consumption rates specifically to differ from the company's projections. Dkt. No. 75-2 at 16–17, 22; *Sec. & Exch. Comm'n*, 741 F. Supp. 3d at 92 ("Viewed in totality, this risk disclosure was sufficient to alert the investing public of the types and nature of the [] risks [defendant] faced and the grave consequences these could present for the company's financial health and future. MongoDB's disclosures warned investors of the same risk Lead Plaintiffs allege investors were misled by—reduction in "customers' consumption of [MongoDB's platform[s]." Dkt. No. 75-2 at 21. MongoDB's disclosures were specific to its company, software, and customer base and not simply "kitchen-sink disclaimer[s], listing garden-variety business concerns that could

63

affect any company's financial well-being." *Cf. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247 (2d Cir. 2016) (concluding that "[t]he jury reasonably could have found" that the disclosure "was not meaningful cautionary language" because the disclaimer was "irrelevant to" and did "not bear even tangentially on Vivendi's liquidity risk").

In particular, MongoDB's disclosures identified a number of factors that might contribute to reduced consumption in the future, including customer-based factors outside of its control. And MongoDB cautioned that "[h]istorically, some of our customers have elected not to renew with their subscriptions with us or have not expanded their usage of our services over time for a variety of reasons, including as a result of changes in their strategic IT priorities, budgets, costs, and in some instances, due to competing solutions." Dkt. No. 75-2 at 16. "As a result," MongoDB disclosed that, "we cannot assure you that customers will renew subscriptions or increase their usage of our software and related services"—that customers would consume in line with historical consumption rates. *Id.* And with respect to Atlas consumption in particular, MongoDB explained that "[w]e derive and expect to continue to derive the majority of our revenue from MongoDB Atlas . . . which is primarily recognized on a usage-basis [and] [a]s such, market adoption and usage of MongoDB Atlas is critical to our continued success." *Id.* MongoDB specifically disclosed that it "cannot guarantee that rate of adoption will continue at the same pace or at all." *Id.* And MongoDB's "warnings were substantively repeated throughout the Class Period." *Gluck v. Hecla Mining Co.*, 657 F. Supp. 3d 471, 485 (S.D.N.Y. 2023).

"In breadth, specificity, and clarity [the] disclosure[s] comfortably aligned with risk disclosures—of various types—that courts have upheld as adequate." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 579 (collecting cases); *Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 539 (S.D.N.Y. 2023) (concluding that the warning that "[a]ctual results may differ materially from those contained in or

implied by these forward-looking statements due to risks and uncertainties associated with our

business" alongside language acknowledging the "uncertainty of future subscriber growth," [] that

'the market for our products and services is still in the early stages of growth and if it does not

continue to grow, grows more slowly than we expect, or fails to grow as large as we expect, our

business, financial condition, and operating results may be adversely affected'" was meaningful

cautionary language).[65]  *Cf. In re Salix Pharms., Ltd.*, No. 14-CV-8925, 2016 WL 1629341, at *11

(S.D.N.Y. Apr. 22, 2016) (finding that the cautionary language that "[a]ctual results might differ

materially from those indicated by these forward-looking statements as a result of various important

factors" was boilerplate because it was "brief and generic" and "fail[ed] to identify even a single

'important factor' that could lead to different results.").  For example, in *Steamship Trade Association*,

the court rejected the plaintiff's argument that the cautionary language at issue[66]—which was of

similar breadth and specificity to MongoDB's disclosures here—was "mere boilerplate."  704 F.

Supp. 3d at 444.  The *Steamship Trade Association* court concluded that the warning that "[c]ustomers

may not renew their contracts with us or reduce their use of our platform for any number of

reasons," conveyed substantive information and was accordingly, meaningfully cautionary.  *Id.*

And while it is true that "MongoDB may not have specifically predicted the manner in

which the risk allegedly manifested," Mem. at 23—for instance, that its transition to a consumption-

based sales model would result in, as Lead Plaintiffs allege, a "glut" of workloads that were not

---

[65] And here, like in *Robeco*, MongoDB's "warnings were substantively . . . repeated throughout the Class Period." *Robeco Cap.*, 665 F. Supp. 3d at 539.

[66] The disclosures at issue in *Steamship Trade* provided:

> Customers may not renew their contracts with us or reduce their use of our platform for any number of reasons, including if they are not satisfied with our platform or modules, the value proposition of our platform or our ability to meet their needs and expectations, security or platform reliability issues, or if they decide to build their own solution internally or if they decide to temporarily or permanently close their restaurants in a location then affected by the COVID-19 pandemic.

704 F. Supp. 3d at 444.

consuming in line with historical rates[67]—"a defendant need not include the particular factor that ultimately causes its projection not to come true in order to be protected by the meaningful cautionary language prong of the safe harbor." *Slayton*, 604 F.3d at 773; *Sec. & Exch. Comm'n*, 741 F. Supp. 3d at 92 ("To the extent the SEC, in terming the disclosure generic, means to fault SolarWinds for not spelling out these risks in greater detail, the case law does not require more. . . ."). Rather, because MongoDB's "disclosure [was] [] broad enough to cover [the] [] specific risk,"—a decrease in consumption rates based on customer usage factors— it is not rendered meaningless "simply because it fails to discuss the specific risk." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 579 (citing *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 730–31 (2d Cir. 1998)). Accordingly, MongoDB's risk disclosures incorporated meaningfully cautionary language that was sufficient to apprise investors of the risk of declining consumption rates and was not mere boilerplate.

Second, Lead Plaintiffs contend that the forward-looking statements,[68] including one challenged statement from MongoDB's Form 10-K itself,[69] are nonetheless actionable, even if accompanied by meaningful cautionary language, because the risk that new workloads were not consuming as expected had already materialized at the time the statements were made. Opp'n at 19. Lead Plaintiffs' argument suffers from two principal failures. First, the argument ignores that Defendants' risk disclosures were "not simply forward-looking." *Hawaii Structural Ironworkers Pension*

---

[67] That said, throughout the Class Period MongoDB's leadership identified the risks associated with the company's transition to a consumption-based model with more specificity. The Individual Defendants emphasized that sales representatives were "no longer incentivize[d] to sign customers to 1-year commitments," which "has short-term impact on cash flow" and resulted in "far fewer upfront commit[ments]." Dkt. No. 75-7 at 6; AC ¶ 47 (Mr. Gordon: "[W]e are intentionally collecting less cash upfront in order to win more workloads more quickly."). And, as Lead Plaintiffs identify, Ms. Gill also acknowledged these risks stating that "when you have a unit-based plan you always run into the risk of driving a lot of low-quality stuff. . . . And we had a lot of reps that were overachieving, landing 'new logos' that has signed a contract but never even actually consumed.'" AC ¶ 50.

[68] *See supra* note 60.

[69] AC ¶ 82 ("There is a risk that customers will consume our MongoDB Atlas offering more slowly than we expect, and our actual results may differ from our forecasts and our future revenue may be less predictable going forward due to, among other things, fluctuations in the rate of customer renewals and expansions and seasonality of, or fluctuations in, usage of MongoDB Atlas.").

*Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 82, 839 (S.D.N.Y. 2019).  Defendants explicitly "disclosed that th[e] risk [of reduced consumption] has already . . . materialize[d]" in the past, *id.*, stating that "[h]istorically, some of our customers have elected not to renew their subscriptions with us or have not expanded their usage of our services over time."  Dkt. No. 75-2 at 17.

Next, and more significantly, Lead Plaintiffs do not adequately plead that the risk that MongoDB's change to a consumption-based model resulted in a "glut of slow-growing, 'low-quality' workloads," Opp'n at 1, had meaningfully materialized.  *Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund*, 704 F. Supp. 3d at 445.  Lead Plaintiffs have not adequately pleaded that the FY 2024 workloads *generally* did not consume at historical rates.  Lead Plaintiffs rely predominantly on Ms. Gill's comments made during the "Rethinking Sales Consumption for a Consumption-Based GTM with MongoDB" workshop to support the conclusion that MongoDB's new go-to-market strategy "in fact led [] MongoDB[] . . . to acquire a substantial number of workloads that did not consume."  Opp'n at 6 (quoting AC ¶ 50).

But Ms. Gill's statements during that workshop do not support the conclusion that MongoDB's change to a consumption-model resulted in a "glut" or "substantial number" of new workloads that were not consuming as expected because Ms. Gill's comments were not about the newly acquired FY 2024 workloads generally.  Ms. Gill only spoke to a subset of the FY 2024 workloads—the "logos" or new workloads from new customers—and such comments cannot support a conclusion that new FY 2024 workloads "as a whole," including new workloads from existing customers, which would have been outside the logo team's scope, were not consuming in line with historical rates.  *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196 (S.D.N.Y. 2018) ("[T]hese allegations do not support the existence of 'contrary facts' available to Defendants, given the limited insight these Former Employees had into UTAS as a whole."), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019).

"At most, [Ms. Gill] offered the anecdotal information that when MongoDB's 'new logo' team first launched, some unspecified number of that team's sales representatives landed customers 'that did not actually consume, leading" MongoDB to make additional adjustments to its incentive structure.  Mem. at 25.  Ms. Gill did not provide any more specificity than that—"[s]he did not quantify the number of new logo team members or nonconsuming logos she spoke about, the share of new logos that were nonconsuming, or the consumption levels of new workloads acquired from existing customers."  Reply at 12; *see generally* Gill. Tr.  And Ms. Gill "said nothing to suggest that FY 2024 workloads were consuming at low rates *Company-wide* or negatively impacting *Company-wide* metrics." Reply at 12 (emphasis in original).

A statement discussing only a subset of a particular subset of the FY 2024 workloads—the logos—cannot be extrapolated more broadly to support the conclusion that all (or even most) of the new FY 2024 workloads were not consuming in line with historical consumption rates.  *City of Hialeah Emps.' Ret. Sys.*, 153 F.4th at 296 (in part affirming dismissal because "plaintiffs failed to plead with particularity that demand had softened" when the only allegations supporting such a conclusion were based on a single confidential witness's "anecdotal" recounting that "did not reflect Peloton's performance as a whole").  Lead Plaintiffs provide no additional basis to infer from these statements that, as they allege, FY 2024 workloads were "as a general matter, 'consuming and growing at slower than historical rates.'"  Mem. at 25 (quoting AC ¶ 90).  Because Ms. Gill's statements, read in context, do not support the conclusion that MongoDB's change to a consumption model resulted in a "glut" of workloads that were not consuming as expected across MongoDB's customer base, Lead Plaintiffs have not adequately pleaded that this risk had already materialized at the time the challenged statements were made.

And in any event, that Lead Plaintiffs have not adequately pleaded that a "glut" of the new workloads were not consuming as expected is underscored by the fact that MongoDB "undisputedly

68

continued to grow during the class period." *Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund*, 704 F. Supp. 3d at 445 (concluding that the plaintiff did not adequately allege that the risk had meaningfully materialized because "[w]hile the SAC does allege that Olo was experiencing growing pains, it does not adequately allege that Olo was experiencing a growth slowdown . . . Olo undisputedly continued to grow") .

Accordingly, because some of the challenged statements are forward-looking statements accompanied by meaningful cautionary language, and because Lead Plaintiffs have not adequately pleaded that the risk they complain of had materialized at the time the statements were made, the forward-looking statements[70] are not actionable.

### iv.    The Actionable Challenged Statements

Having concluded that some, but not all, of the challenged statements are inactionable because they are puffery, statements of opinion that are not rendered misleading by omission of the alleged fact of the FY 2024 workloads' consumption rates, did not trigger an obligation to speak, or were forward-looking statements accompanies by meaningful cautionary language, the Court pauses to identify the challenged statements that remain.

The challenged statements that are actionable are—

Mr. Ittycheria's June 1, 2023 statement during MongoDB's Q1 earnings call, "it's all about us acquiring high-quality workloads.  If we can []acquire high-quality workloads, onboard them well and make sure they're serviced as well, good things will happen, *and that's happening.*"  AC ¶ 89 (emphasis added);

Mr. Tanjga's January 16, 2024 response during the Needham Growth Conference:

Question:  [L]ast year was a big change, right, for the sales organization.  So are there any learnings or anything we should keep in mind, again, when thinking about comparisons, *whether on a revenue consumption basis and then new workloads or sales payout that occurred last year,* which may not be recurring this year?

Response:  "[A]nd it wasn't actually terribly disruptive, given the size of the change that it was not in terms of sales attrition or anything like that," and "[w]e also see it in

---

[70] *See supra* note 60.

the volume of new workloads, which is where we started the conversation and how good we feel about that. *But as you think about like what does that mean in terms of compares or mechanics of the financial model for next year, nothing particular to call out.*"  *Id.* ¶ 122 (emphasis added);

Mr. Ittycheria's March 7, 2024 statement during MongoDB's Q4 2024 earnings call, "Atlas consumption trends have been steady for several quarters now and we experienced less consumption variability in fiscal '24 compared to fiscal '23." *Id.* ¶ 127;

And Mr. Gordon's May 2, 2024 statement during MongoDB's NYC Keynote session, "And what you can see if as you add in those first workloads, they sort of are accretive to growth, right?  They're adding to the growth rate."[71]  *Id.* ¶ 134.

### B. Scienter

#### 1. Legal Standard

Lead Plaintiffs have adequately pleaded that MongoDB's actionable statements were made with a wrongful state of mind.  Under the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA, a plaintiff alleging securities fraud must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); *see also In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th at 51.  The question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322–23 (2007).

"The requisite state of mind in a section 10(b) and Rule 10b–5 action is an intent 'to deceive, manipulate, or defraud.'" *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago*, 553 F.3d at 198 (quoting *Tellabs*, 551 U.S. at 313).  "In addition to intent, recklessness is a sufficiently culpable mental state for securities fraud in this circuit." *Id.*  That standard can be satisfied "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute

---

[71] The parties did not provide the Court with the visual aids Mr. Gordon was referencing when making this statement. As a result, the Court, in analyzing this statement, does not have access to the full context in which this statement appeared, namely the underlying visual aids.

strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotation marks and citation omitted). A plaintiff need not rely exclusively on one of these theories. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Id.* (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).

Reckless conduct is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In Re Carter-Wallace Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (internal quotation marks and citation omitted). A plaintiff alleging recklessness must allege "conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015) (internal quotation marks and citation omitted). "Securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142 (internal quotation marks and citation omitted). "Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.* (internal quotation marks and citation omitted).

An "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *In Re Shanda Games Ltd. Sec. Litig.*, 128 F.4th at 51 (quoting *Tellabs*, 551 U.S. at 314). If an inference of fraudulent intent is not "at least as compelling" as a contrary inference, it is inadequate, even in a "close case." *Slayton*, 604 F.3d at 777. An inference of scienter need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (quotation

omitted); *see also City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) ("[A]t the motion to dismiss stage, a tie on scienter goes to the plaintiff."). "But generic and conclusory allegations based upon rumor or conjecture are undisputedly insufficient to satisfy the heightened pleading standard." *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 336 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010) (citation modified). "Thus, a complaint 'which fails to adduce any specific facts supporting an inference of knowledgeable participation in the alleged fraud, will not satisfy even a relaxed standard.'" *Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 393 (S.D.N.Y. 2001) (quoting *Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir.1987)).

"While 'the absence of a motive allegation is not fatal,' motive can be a relevant factor, and 'personal financial gain may weigh heavily in favor of a scienter inference.'" *Slayton*, 604 F.3d at 776 (quoting *Tellabs*, 551 U.S. at 325). Absent a showing of motive, "the strength of [Plaintiff's] circumstantial allegations must be correspondingly greater." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.*, 553 F.3d at 199 (quoting *Kalnit*, 264 F.3d at 142). In sum, "[t]he inquiry on a motion to dismiss is as follows: '[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?'" *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 383 (S.D.N.Y. 2007).

### 2.  Application

The AC adequately pleads facts that raise a strong inference of scienter. The AC's scienter allegations track the two avenues for pleading scienter: allegations that Defendants had "motive and opportunity" to deceive and allegations that Defendants knew, but "recklessly disregarded" the FY 2024 workloads' poor quality. And Lead Plaintiffs supplement their "motive and opportunity" and "reckless disregard" allegations with allegations that the "core operations" doctrine bolsters an inference of scienter here. The Court assesses these categories of allegations "holistically,"

"accepting the whole factual picture painted by the Complaint," *Slayton*, 604 F.3d at 775 (quotations omitted), and concludes that Lead Plaintiffs' allegations give rise to an "inference of scienter [] at least as compelling as any opposing inference of nonfraudulent and nonreckless intent." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 111 (2d Cir. 2009).

### i.    Lead Plaintiffs Have Adequately Pleaded that the Individual Defendants Had "Motive and Opportunity" to Deceive

To start, Lead Plaintiffs have adequately pleaded that the Individual Defendants had "motive and opportunity" to deceive. Lead Plaintiffs' allegations of suspicious insider sales support an inference that the Individual Defendants possessed a motive to commit securities fraud. Lead Plaintiffs rely on the AC's allegations of stock trades made by the Individual Defendants, which they argue support an inference of scienter because those sales "were highly unusual in both amount and timing," AC ¶ 160, as they were made during the Class Period and following two quarters worth of data showing poor performance of the FY 2024 workloads. *Id.* ¶¶ 71–72. "The Second Circuit has acknowledged that an inference of motive may arise where 'corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit,'" *In re Iconix Brand Grp., Inc.*, No. 15 CIV. 4860, 2017 WL 4898228, at *15 (S.D.N.Y. Oct. 25, 2017) (quoting *ECA*, 553 F.3d at 198), if "those trades are suspicious in timing or amount," *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 584 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). "However, 'executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent.'" *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 486–87 (S.D.N.Y. 2021) (quoting *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004)).

The "massive insider selling spree," AC ¶ 72, alleged in the AC gives rise to a strong inference of fraudulent intent because Lead Plaintiffs have plausibly pleaded that the selling spree was suspicious in both amount and in timing. First, Lead Plaintiffs have adequately pleaded that the sales are suspicious in amount. In determining whether the amount of stock sales is suspicious, a

73

district court may consider factors including "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001). Mr. Ittycheria and Mr. Gordan are alleged to have sold a combined total of over $234 million worth of stock during the Class Period; a significant sum. *Id.* Specifically, Lead Plaintiffs allege that Mr. Ittycheria sold approximately $184.21 million worth of MongoDB common stock, accounting for 68%[72] of his holdings. *Id.* ¶ 160. And Mr. Gordon sold approximately $50.09 million worth of MongoDB stock, accounting for 59% of his holdings. *Id.* Lead Plaintiffs also allege that Mr. Ittycheria nearly doubled his profits from the previous year and Mr. Gordon earned nearly eighteen times what he did in the preceding year. *Id.* The portion of stockholdings sold, and the profits earned, supports that the amount of stock sold was "unusual in light of [] past trading practices" because the Individual Defendants were alleged to be selling much more conservatively in preceding years where new workloads were consuming as expected. *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 137 (S.D.N.Y. 2020) (finding that "only 10%" of sale of stockholdings was sufficiently unusual given that the sale was alleged to be a departure from the individual defendant's prior trading practices).

Second, Lead Plaintiffs have adequately pleaded that the timing of the stock sales was suspicious. Lead Plaintiffs allege that the trades were "made [] on the heels of [] misrepresentation[s] designed to inflate" MongoDB's stock prices and "before the disclosure of bad

---

[72] Defendants argue that MongoDB's SEC filings "make clear that the total shareholdings of Mr. Ittycheria and Mr. Gordon decreased by only approximately 20% during the alleged class period." Mem at 29 n.21. Although Defendants contest Lead Plaintiffs' allegations with respect to the proportion of stockholdings sold, "whether plaintiffs can prove their allegations is not to be resolved on a Rule 12(b)(6) motion." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 75 (declining to address Defendants' argument that the Lead Plaintiff's allegations that the individual defendant was "alleged to have sold 80 percent of his holdings within a matter of days for a not insignificant profit" because this question is a factual one inappropriate for resolution at the motion to dismiss stage). Accordingly, for the purposes of this motion, the Court accepts Lead Plaintiffs' allegations that Mr. Ittycheria and Mr. Gordon sold 68% and 59% of their common stock holdings respectively.

news"[73] with respect to the non-consumption of newly-acquired Atlas workloads. "Timing is an indicia of fraud when sales occur shortly after insiders allegedly learn undisclosed adverse information or made affirmative misrepresentations." *Zornberg v. NAPCO Sec. Techs., Inc.*, 2025 WL 1093015, at *4 (E.D.N.Y. Apr. 11, 2025). On June 1, 2023—the same day that Mr. Ittycheria stated that "it's all about us acquiring high-quality workloads" and "if we can []acquire high-quality workloads . . . good things will happen, and that's happening," AC ¶ 89—he sold 20,000 shares of stock accounting for $5,746,448 in proceeds, *id.* ¶ 159.[74] And a few weeks after Mr. Tanjga stated that MongoDB's change to a consumption-based model was not "terribly disruptive" and that there was not anything in "particular to call out" with respect to the FY 2024 workloads' consumption rates, Mr. Gordon made three transaction nearly back-to-back, selling a total of 25,306 shares totaling $11,939,993 in profits. *Id.* Because Lead Plaintiffs plead that the stock sales were timed to account for Defendants' statements in order to inflate stock prices, they have adequately pleaded that the timing of the sales was also suspicious. Accordingly, because Leads Plaintiffs have adequately pleaded that the stock sales were suspicious in both amount and in timing, Lead Plaintiffs have adequately pleaded motive and opportunity.

The fact that the majority[75] of Mr. Ittycheria's and Mr. Gordan's stock sales were made pursuant to Rule 10b5-1 trading plans, a fact that Lead Plaintiffs do not dispute, does not undermine any inference of fraudulent intent on the particular facts of this case. Opp'n at 33. It is well-established that in the usual case, "trades under 10b-5-1 plan[s] do not raise a strong inference of

---

[73] Specifically, Lead Plaintiffs allege that during the month of November 2023, the same month when Mr. Gill acknowledged that some subset of the new logo team had acquired some logos "that never even actually consumed," Mr. Ittycheria and Mr. Gordon sold $49 million and $28 million worth of stock respectively. AC ¶ 162.

[74] And on March 1, 2024—just one week before Mr. Ittycheria represented that "Atlas consumption trends have been steady for several quarters now and we experienced less consumption variability in fiscal '24 compared to fiscal '23," AC ¶ 127—Mr. Ittycheria sold 33,000 shares totaling $14,478,288 in proceeds, *id.* ¶ 159. And on April 2, 2024, one month later, Mr. Ittycheria sold another 17,160 in shares totaling nearly six million in proceeds. *Id.*

[75] Lead Plaintiffs do not dispute that Mr. Gordan's Form 4 filings show that all of the sales not made pursuant to a 10b5-1 plan were made to cover tax withholding obligations. Nor do they dispute that, aside from one transaction at the beginning of the Class Period, the same is true for Mr. Ittycheria.

scienter." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) (quotations omitted); *see also, e.g.*, *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 272 (S.D.N.Y. 2009) (dismissing scienter claims predicated on trades made pursuant to Rule 10b5-1 plans, noting that such trades are "non-discretionary, . . . which undermines any allegation that the timing or amounts of the trades was unusual or suspicious"); *Fishbaum v. Liz Claiborne, Inc.*, No. 98–9396, 1999 WL 568023, at *4 (2d Cir. 1999) (affirming dismissal of securities-fraud claims on scienter grounds, noting that defendants' alleged trades "were not suspicious" as they "appeared to be part of a periodic divestment plan").

"That axiom does not apply, however, where a 10b5-1 plan is entered into—or strategically amended—to take advantage of an inflated stock price or insider information." *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012). Rather, when, as here, "executives enter into a trading plan during the Class Period and the Complaint sufficiently alleges that the purpose of the plan was to take advantage of an inflated stock price, the plan provides no defense to scienter allegations." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015); *see also Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 494 (S.D.N.Y. 2018) ("'[W]here (as here) 10b5-1 trading plans are entered into during the class period, they are not a cognizable defense to scienter allegations on a motion to dismiss.'"), *vacated in part on other grounds*, *Abramson*, 965 F.3d at 165 (quoting *George v. China Auto. Sys., Inc.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012); then citing *Freudenberg v. E*Trade Fin'l Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010) (collecting cases)).

"This is because a 'clever insider might maximize their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan." *Id.* (quoting *Freudenberg*, 712 F. Supp. 2d at 199). Defendants do not dispute—rather they themselves highlight—that the 10b5-1 trading plans were adopted during the Class Period. Specifically, Mr. Gordon's and Mr. Ittycheria's 10b5-1 trading plans were adopted on June 9, 2023

and June 26, 2023, respectively.  Dkt. No. 75-13 at 66.  And Mr. Ittycheria adopted his 10b5-1 trading plan just one week after he commented that "it's all about us acquiring high-quality workloads.  If we can []acquire high-quality workloads, onboard them well and make sure they're serviced as well, good things will happen, and that's happening."  AC ¶ 89.  Accordingly, the fact that the 10b5-1 training plans were entered into shortly after the beginning of the Class Period does not, on the facts of the case here, undermine Lead Plaintiffs' allegations with respect to motive and opportunity.  And the suspicious timing of the adoption of the 10b5-1 plans within the Class Period lends additional support to the inference that Defendants had motive and opportunity.

Finally, Mr. Pech, who is not named as a defendant in this action, is alleged to have sold $20.47 million worth of common stock during the Class Period.  *Id.* ¶ 160.  Mr. Pech's trades, standing alone, do not give rise to a strong inference of motive because, "misconduct by non-defendants cannot be used to allege Defendants' scienter."  *Alaska Laborer Emps. Ret. Fund v. Scholastic Corp.*, No. 07 CIV. 7402, 2010 WL 3910211 (S.D.N.Y. Sept. 30, 2010).  But as Lead Plaintiffs contend, Mr. Pech's sales are probative of motive here "because he provided officer-level oversight of MongoDB's sales and [go-to-market] initiatives and would have been aware of (if not directed) the corrective measures that MongoDB undertook as a result of the slowed workload growth."  Opp'n at 33 n.38.  Accordingly, while Mr. Pech's sales standing alone may be insufficient to give rise to a strong inference of motive, in conjunction with Lead Plaintiffs' other allegations, Mr. Pech's sales support an inference of motive.  In sum, Lead Plaintiffs have adequately pleaded a strong inference of scienter under a "motive and opportunity" theory.

### ii.  Lead Plaintiffs Have Adequately Pleaded Conscious Misbehavior or Recklessness

Second, Lead Plaintiffs have also adequately pleaded a strong inference of conscious misbehavior or recklessness because they have adequately pleaded that the Individual Defendants had access to, were aware of, and yet disregarded information about the FY 2024 workloads'

consumption rates that rendered the challenged statements misleading. *Novak*, 216 F.3d at 308. A plaintiff makes "an adequate showing of scienter through recklessness where the complaint alleges that the defendants had access to certain information . . . and supports those allegations with particular facts." *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 522 (E.D.N.Y. 2025). Here, Lead Plaintiffs adequately plead that the Individual Defendants had access to consumption rate data because they had access to a Salesforce software program, developed by Ms. Gill and her team following MongoDB's transition to a consumption-based model, which provided daily and quarterly updates on users' consumption of MongoDB's platforms. AC ¶¶ 44, 55, 110, 153. And throughout the Class Period, MongoDB and its executives "closely tracked workload-related consumption data in order to analyze [and forecast] the growth pattern of new Atlas workloads . . . [and] to ensure that [new workload acquisition] goals were being met." *Id.*

And Mr. Ittycheria held "weekly staff meetings," throughout the Class Period[76] during which he "welcome[d] people to raise thorny issues and encourage[d] them to share their concerns." AC ¶ 57 n.16. It was also Mr. Ittycheria's practice to "attend[] quarterly review sessions and QBRs or reviews to attend sales forecast reviews." *Id.* ¶ 59. Because MongoDB's forecasting primarily depends on its workloads' projected consumption rates, it is a reasonable inference that at either the weekly staff meetings or during the QBRs, the Individual Defendants had access to and were informed that the FY 2024 workloads were not consuming in line with historical rates. *In re SolarEdge Techs., Inc. Sec. Litig.*, No. 1:23-CV-9748, 2025 WL 1031154, at *12 (S.D.N.Y. Apr. 6, 2025) (finding that it was reasonable to infer from the individual defendants attendance at QBRs that the executives "were informed" that the company's demand in Europe was struggling). All the while,

---

[76] As noted above, some of Lead Plaintiffs' allegations reference statements by the Individual Defendants that pre and post-date the Class Period. For example, Lead Plaintiffs allege that since Mr. Ittycheria became CEO in 2014, "he has set himself apart as an 'in-the-trenches' manager" who attended weekly sales meetings where such data was discussed are unavailing. AC ¶ 57. Because Lead Plaintiffs have plausibly alleged conscious misbehavior or recklessness based on statements made during the Class Period, the Court need not decide whether statements made outside the Class Period also support an inference of scienter here.

MongoDB's executives were publicly telling investors that MongoDB was acquiring "high quality workloads" and that there was "nothing in particular to call out" with respect to the new workloads' consumption rates.  AC ¶¶ 89, 122.

Lead Plaintiffs have also adequately pleaded facts that support the inference that the Individual Defendants reviewed and were aware of FY 2024 consumption data to which they had access because the Individual Defendants' public statements reference the consumption data, its importance, and how they used that data.  Because the Individual Defendants' statements were "specific" to the issue of consumption rates, "'[t]he specificity of [such] statements regarding [the issue] is strong circumstantial evidence that [Defendants] were receiving some form of specific information' regarding the relevant issue."  *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d at 522 (quoting *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (concluding that the defendants' specific statements about the issues sufficed to establish recklessness); then citing *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395–96 (S.D.N.Y. 2012) (finding that scienter can be inferred based on the defendant's specific statements about a specific issue); then citing *San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 320 (S.D.N.Y. 2024) ("Although Plaintiffs don't identify the specific document containing the contradiction, they don't need to."))).

For instance, during MongoDB's August 31, 2023 earnings call, Mr. Gordon noted that "we continually review and analyze product usage signals to determine the growth potential of our customers."  AC ¶ 61.  Also, during each of MongoDB's earnings calls throughout the Class Period, Mr. Gordon repeatedly reported on the strength of "week-over-week" growth rates.  *Id.* ¶ 60. Similarly, on September 7, 2023, Mr. Tanjga touted that "we have access to a tremendous amount of data" and that "we use that data and usage patterns to judge our customers' potential."  *Id.* ¶¶ 63, 110.  Mr. Tanjga explained that the "real-time data is helpful because we can revisit [] decisions as we

go along." On December 7, 2023, Mr. Tanjga further opined that "we spend a tremendous amount of time focusing on" whether MongoDB's new workloads are "the same quality or better" than workloads acquired in the past.[77] *Id.* ¶ 110. And during a May 14, 2024 podcast interview, Mr. Ittycheria identified that a "consumption based business gives you a real time view of demand," and, as he explained, such real-time visibility allowed MongoDB to "engage[] with the customers on a daily, worst case weekly, basis to understand what's going on." *Id.* "These are not some generic statements about [defendant's] policies and procedures," rather "[t]hey are very specific in addressing the very same issue . . . that became the centerpiece of this litigation. *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d at 525; *City of Pontiac Gen. Employees' Ret. Sys.*, 875 F. Supp. 2d at 372 (same).

It is reasonable to infer from these statements that because the Individual Defendants were reviewing both current and prior consumption rate data in order to draw comparisons between that data, and because they were reviewing current consumption data in "real time"—and even daily—that the Individual Defendants were aware of the FY 2024 new workloads' consumption rates. *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, No. 22-CV-6978, 2024 WL 456745, at *5–6 (S.D.N.Y. Feb. 5, 2024) (finding inference of recklessness where the defendant stated, "we are . . . able to monitor the daily influx of demand," because it allowed for the logical inference that the defendant "either knew that demand had fallen . . . or at least had access to that information"). And because Defendants' own statements "indicate that they were in fact monitoring contemporaneous statistics," *In re CarLotz, Inc. Sec. Litig.*, No. 21-CV-5906, 2024 WL 1348749, at *16 (S.D.N.Y. Mar. 29, 2024), with respect to the FY 2024 new workloads' consumption rates, the statements provide "strong circumstantial evidence that [the defendants] were receiving some form of specific

---

[77] Just over one month later, Mr. Tanjga stated that MongoDB's change to a consumption model "wasn't actually terribly disruptive, given the size of the change that it was not in terms of sales attrition or anything like that" and claimed that there was "nothing particular to call out." AC ¶ 122.

information" as to consumption rates. *City of Pontiac Gen. Employees' Ret. Sys.*, 875 F. Supp. 2d at 372. Accordingly, because Lead Plaintiffs have adequately pleaded that the Individual Defendants had access to and were aware of data with respect to the FY 2024 new workloads' consumption rates, they have adequately pleaded a strong inference of conscious misbehavior or recklessness.

### iii.    The "Core Operations" Doctrine Bolsters an Inference of Scienter

"Under the core operations doctrine, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of income." *In re AppHarvest Securities Litig.*, 684 F. Supp. 3d 201, 246 (S.D.N.Y. 2023) (quoting *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *17 (S.D.N.Y. May 19, 2023)). "The core operations doctrine, however, 'has been thrown into doubt by the enactment of the PSLRA in 1995.'" *Id.* (quoting *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 239 (S.D.N.Y. 2022)); *see also In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.). "As a result of these doubts as to the doctrine's continuing import, the core operations inference may be considered as part of a court's holistic assessment of the scienter allegations, but it is not independently sufficient to raise a strong inference of scienter." *In re AppHarvest*, 648 F. Supp. 3d at 246 (quoting *In re Turquoise Hill*, 625 F. Supp. 3d at 239) (citation modified). "Put differently, 'core-operations allegations are 'supplementary'; that is, they are not independently sufficient means to plead scienter.'" *Id.* (quoting *Saraf v. Ebix, Inc.*, 632 F. Supp. 3d 389, 398 (S.D.N.Y. 2022)).

Here, because Lead Plaintiffs have adequately pleaded conscious misbehavior and motive and opportunity, Lead Plaintiffs' "core operations" allegations bolster an inference of scienter. There is no serious dispute in this case that new workload acquisition and consumption significantly impact MongoDB's growth, development, and revenue—workload acquisition and consumption is the heart of MongoDB's business. Nor do the parties seriously dispute that MongoDB's acquisition

81

of new Atlas workloads specifically (and those workloads' consumption) accounts for a significant portion of MongoDB's business, revenue, and growth prospects. AC ¶¶ 83, 153. Instead, Defendants only argument with respect to the core operations doctrine is that the doctrine is "not independently sufficient to raise a strong inference of scienter." Mem. at 33. Accordingly, because Lead Plaintiffs have adequately alleged a strong inference of scienter on separate grounds, Lead Plaintiffs' core operations allegations bolster the inference of scienter.

Lead Plaintiffs have also adequately pleaded corporate scienter. Pleading corporate scienter requires "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). "[M]ost courts look to the discrete roles played by the corporate actors who are connected to the alleged misrepresentation to determine which (if any) fall within the locus of a company's scienter." *Id.* "[T]he most straightforward way to raise a strong inference of corporate scienter is to impute it from an individual defendant who made the challenged misstatement." *Id.* "The scienter of the other officers or directors who were involved in the dissemination of the fraud may also be imputed to the corporation, even if they themselves were not the actual speaker." *Id.* Because Lead Plaintiffs adequately plead that Mr. Ittycheria, Mr. Gordon, and Mr. Tanjga acted with motive and opportunity and recklessness and conscious disregard, giving rise to a strong inference of scienter, Lead Plaintiffs have also adequately pleaded corporate scienter.

### C. Section 20(a) Claims

Because Lead Plaintiffs have adequately pleaded that Defendants are liable for a primary violation of Section 10(b), they have also adequately pleaded their Section 20(a) claims. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007; *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 207 (2d Cir. 2009).

V.    LEAVE TO AMEND

Lead Plaintiffs have requested that they be granted leave to replead the complaint if the Court granted any part of Defendants' motion.  Opp'n at 35 n.44.  Defendants' motion to dismiss is granted in part with leave to amend as described below.  Under Federal Rule of Civil Procedure 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  And "[d]istrict courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)."  *ATSI*, 493 F.3d at 108 (citation omitted).  However, leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).

With respect to the forward-looking statements, Lead Plaintiffs have not adequately pleaded that MongoDB's change to a consumption-based model resulted in a "glut" of low-quality workloads.  And with respect to the statements of opinion, Lead Plaintiffs have not pleaded that the speakers of those opinion statements did not hold the beliefs professed when making them.  The Court cannot conclude that further amendment would not cure these deficiencies in the AC.  Accordingly, the Court grants Lead Plaintiffs leave to file a second amended complaint solely to cure the deficiencies identified with respect to these categories of statements no later than 14 days from the date of this order.

As for all of the other claims, amendment would be futile as those claims involve challenged statements that are inactionable either because the statements are puffery or because the statements did not trigger an obligation to speak.  Accordingly, the remaining claims are dismissed with prejudice and without leave to amend.

## VI.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.  Claims arising from the forward-looking statements and the opinion statements are dismissed with leave to amend.  As such, all other claims are dismissed with prejudice.  The Clerk of Court is directed to terminate the motion pending at Dkt. No. 73.

SO ORDERED.

Dated: April 30, 2026
     New York, New York

_____
GREGORY H. WOODS
United States District Judge

84